JEWETT M. RICHMOND et al., Respondents, *v.* THE UNION STEAM-BOAT COMPANY, Appellant.

The proper mode of delivery of goods transported by water, where not specified in the bill of lading, is determined by the usage and custom of the port of delivery, or the course of trade between the parties.

Where delivery to the consignee is stipulated in the bill of lading, to justify a substituted delivery, the carrier must show that such delivery is in accordance with the usage and custom of the port of delivery.

Plaintiffs' agent shipped at Toledo, on board defendant's propeller, seven thousand bushels of wet wheat, consigned to plaintiffs, which, by the bill of lading, defendant contracted to deliver to the consignees at Buffalo. There were also shipped upon the propeller twenty thousand bushels of wheat consigned to other parties. The only method of delivering wheat at the port of Buffalo was into elevators. Plaintiffs requested defendant to discharge the wheat into the R. elevator. This it refused to do, but discharged it into the N. elevator, which was designated by the consignees of the major portion of the cargo. Plaintiffs alleged in their complaint and gave evidence tending to establish that by the custom at the port of Buffalo, when grain in the same vessel was consigned to different consignees, each consignee could designate the elevator into which his grain should be discharged, and that the carrier was bound to there discharge it. The court found that " the course of trade by the parties hereto, and the general usage of all carriers of grain upon propellers into the port of Buffalo, was to deliver their cargo or parts of cargo at such elevator in such port as the consignee thereof designated." Plaintiff, to obtain the wheat, was compelled to pay the freight. In an action to recover back the same as paid under duress, and also to recover the expense of removal from the N. to the R. elevator, *held,* that the word " usage " in the finding, was equivalent to " custom ," and that the delivery at the N. elevator was not justified; but *held,* that plaintiff was not entitled to recover both the freight paid and the expense of moving the grain; that as the recovery of the latter would give them what they would have had if defendant had performed its contract, such a recovery would be the most just and equitable.

In the R. elevator was an apparatus for drying wet wheat. *Held*, that had there been no proof of usage or custom, the request of the consignees to have the wheat there delivered was reasonable, and should have been complied with.

(Argued December 1, 1881; decided December 15, 1881.)

APPEAL from judgment of the General Term of the Superior Court of Buffalo, entered upon an order made March 22, 1880, which affirmed a judgment in favor of plaintiffs, entered upon a decision of the court on trial, without a jury.

This action was brought to recover back money alleged to have been paid under duress of property.

The facts are sufficiently set forth in the opinion.

*George B. Hibbard* for appellant. Irrespective of any usage or custom, the property was well delivered at the Niagara elevator, and freight was earned thereon. (*The Convoy's Wheat*, 3 Wall. 225; 3 Kent's Com. 202; Smith on Merc. L. [Am. ed.] 352; *Moore et al.* v. *Am. Transp. Co.*, 24 How. [U. S.] 1; *McAndrew* v. *Whitlock*, 52 N. Y. 40, 52; *Redmond* v. *L., N. Y. & P. S. Co.* 56 Barb. 320; *Robinson* v. *Chittenden*, 7 Hun, 133; 69 N. Y. 525, 526, 534; *The Eddy*, 5 Wall. 481, 485; *Ex parte Easton*, 5 Otto [95 U. S.], 75; *Western Transp. Co.* v. *Hawley*, 1 Daly, 327; *Richardson* v. *Goddard*, 23 How. [U. S.] 28, 39; *Chickering* v. *Fowler*, 4 Pick. 371; *Salmon F. Ins. Co.* v. *The Tangier*, 1 Clif. 396, 400, 401; Edwards on Bail., § 621.) Plaintiffs having accepted the wheat, are liable to pay the freight. (*Green* v. *Clark*, 5 Denio, 497, 503; *Sturges* v. *Bessel*, 46 N. Y. 462; *Rice* v. *The Ontario S. B. Co.*, 56 Barb. 384; *Green* v. *Clark*, 2 Kern. 343, 354.) No custom is established on the part of the plaintiffs which makes the delivery in this case bad, or which changes the legal rule with respect to the delivery of the property. (2 Parsons on Contracts, 52, 56; *Bk. of Commerce* v. *Bissell*, 72 N. Y. 615.)

*Delavan F. Clark* for respondents. It was the duty of the defendant, under the general law, upon the arrival of the Jay

Gould at the port of Buffalo, to have discharged the wheat consigned to the plaintiffs into the Richmond elevator, in conformity to the direction then given by the consignees. (*Gibson* v. *Culver*, 17 Wend. 306 ; *Fisk* v. *Newton*, 1 Denio, 47 ; *Gatliff* v. *Bourne*, 4 Bing. N. C. 314 ; *Dixon* v. *Dunham*, 14 Ill. 328 ; *Steamboat Sultana* v. *Chapman*, 5 Wis. 454 ; " *The Boston*," 1 Lowell's Dec. 464 ; " *The Felix*," 2 Eng. Law. R. Admiralty Div. 273.) The commercial usage does not depend upon the private opinion of merchants as to what the law is, or even upon their opinions publicly expressed, but upon their acts. (*Allen* v. *Merch. B'k*, 22 Wend. 222.) The question of custom was one of fact. *Vermilyea* v. *Palmer*, 52 N. Y. 471 ; *Green* v. *Fortier*, 80 id. 640.) As defendant's agents knew that the Richmond elevator was partially owned and controlled by one of the plaintiffs, and as defendant had been accustomed to deliver grain there consigned to plaintiffs, it may be presumed that the contract of carriage was made with reference to such usage. (2 Phil. on Ev. [4th Am. ed.] 797 ; 2 Greenl. on Ev., § 251 ; *Loring* v. *Gurney*, 5 Pick. 15 ; *F. & M. B'k* v. *Champ. Tr. Co.*, 23 Vt. 212.) As the delivery at the Niagara elevator was not a proper or good delivery, no freight was earned. (*Rowland* v. *Miller*, 2 Hilt. 150 ; *West Tr. Co.* v. *Hoyt*, 69 N. Y. 230 ; *N. Y. C. R. R. Co.* v. *Standard Oil Co.*, 9 W. Digest, 389.) Plaintiffs were entitled to recover back the freight paid by them and also the cost of transporting the wheat to their elevator. (*Harmony* v. *Bingham*, 12 N. Y. 99.)

EARL, J. On the 1st day of October , 1875, the agent of the plaintiffs, at Toledo, shipped on board the propeller " Jay Gould," which was owned by defendant, a common carrier, consigned to the plaintiffs at Buffalo, seven thousand bushels of wet wheat. There was also shipped upon the propeller and consigned to other parties at Buffalo, upwards of twenty thousand bushels of wheat. The propeller went to Buffalo and discharged all the wheat into the Niagara elevator, and refused to discharge plaintiffs' wheat, upon their request, into the Richmond ele-

vator.    After plaintiffs' wheat was so discharged at the Niagara elevator, in order to obtain the same so as to place it in the Richmond elevator, they were required by the defendant's agent to pay the freight, to-wit, $183.66, and also incurred expense to the amount of $80.75 in removing the wheat to the Richmond elevator.    The plaintiffs claim that the defendant did not earn freight by delivering the wheat into the Niagara elevator, but that they were obliged to pay the freight under duress, in order to procure the wheat, and this action was brought to recover the amount paid for freight, as well as the expense of the removal of the wheat.

The bill of lading under which plaintiffs' wheat was consigned provided that the grain should be delivered "unto the consignees" at Buffalo.  It was undisputed upon the trial and upon the argument before us that the only way of delivering wheat at the port of Buffalo was into elevators; that the defendant had no elevators, and that there was no particular elevator at which it was accustomed to deliver freight; that the carriers did not have the right at the port of Buffalo to select the elevator into which the grain carried by them should be discharged, and that when the whole cargo of grain was consigned to one consignee he had the right to select the elevator into which the grain should be discharged.    But the defendant alleges in its answer that it was the custom at the port of Buffalo, that when the cargo was consigned to different consignees, the owner or owners of the major part of the cargo could designate the elevator into which the whole cargo should be discharged, and that the owner of the minor part of the cargo could not claim to have his grain delivered into any other elevator; and the proof shows that the consignees of the major part of the cargo of the "Jay Gould" designated the Niagara elevator as the elevator into which the grain should be discharged.    The defendant, therefore, insists that it discharged its duty under its contract of affreightment by placing the plaintiffs' grain in that elevator.    The plaintiffs, however, allege in their complaint that it was the custom at the port of Buffalo that when grain in the same vessel came there con-

signed to different consignees, each consignee could designate the elevator into which his grain should be discharged, and that the carrier was bound to discharge it according to such designation. Upon the trial, the defendant gave evidence tending to prove a custom such as it alleged, and the plaintiffs gave evidence tending to establish the custom as they alleged it to be, and the court, at Special Term, refused to find the custom as alleged by the defendant, but found it as alleged and claimed by the plaintiffs, in the following language, to-wit: " That for a number of years prior to the making of said contract, and at such time, the course of trade by the parties hereto, and the general usage of all carriers of grain upon propellers into the port of Buffalo, and known to these parties, was to deliver and discharge their cargo or parts of cargo at such elevator in such port as the consignee thereof designated." We think, after a careful examination of all the evidence, that it was abundant to authorize the finding, as to the custom in the port of Buffalo, made by the trial judge, and thus the only issue of fact litigated between these parties was found against the defendant.

When it becomes important to know what custom or usage or course of trade exists in any locality, it is always a question of fact to be determined by the evidence, and where the evidence is conflicting the decision of the trial term, unreversed upon appeal by the General Term, binds and concludes us. It was assumed in the pleadings and upon the trial of this case that the custom existing at the port of Buffalo would control as to the place and manner of discharging the cargo in question, and the custom having been found, as alleged by the plaintiffs, it would seem that nothing more really needed to be said upon that branch of the case. But the earnest and able argument upon the part of the appellant induces us to go a little further. *Prima facie* and generally it is the duty of all common carriers to deliver goods carried to the consignee, unless otherwise directed in the bill of lading. But the necessities of trade and the usages and customs prevailing at the place of delivery may control, and frequently do control, the manner of discharging this duty. A carrier by wagon upon land is required to make de-

livery to the consignee at his place of business or place of residence unless he is directed by him to deliver elsewhere. A carrier upon water, with no means of land transportation, is generally permitted to deliver his freight upon the wharf at the port of discharge, giving reasonable notice of such delivery to the consignee. (*McAndrew* v. *Whitlock*, 52 N. Y. 40; *Ex parte Easton* 5 Otto, 75; *Western Tel. Co.* v. *Hawley*, 1 Daly, 327; *Richardson* v. *Goddard*, 23 How. [U. S.] 28.) When an ocean vessel reaches the port of delivery with a cargo consigned to several different parties, the carrier may generally select any suitable and proper wharf for the delivery. No other mode of delivery might be practicable, and hence, usage and custom sanction such a delivery. Of course a usage could obtain which would make a different delivery obligatory. When an ocean vessel comes into the port of delivery with a cargo all consigned to one consignee, it is not always true that the carrier can select the wharf at which delivery shall be made. It being indifferent to the carrier in such a case, unless there is a different usage, it is believed the consignee would have the right to designate the place of delivery. Such right the consignee would certainly have if he could show that such was the usage and custom at the port of delivery. Usage and the course of trade in these matters, founded as they must be upon commercial necessity and convenience, generally control, and hence, in cases of this kind, the litigation has been very largely upon the question of what the local usages and customs were. Here the bill of lading required this wheat to be delivered "unto the consignees." This was a duty imposed upon the carrier, and it can excuse literal performance of that duty, according to the terms of the bill of lading, only by showing a substituted delivery sanctioned by the usage of trade and commerce at the port of Buffalo; and as we have seen, it made a substituted delivery, not only not sanctioned by such usage and custom, but, according to the finding of the trial court, in violation of such usage and custom. In the case of *Steamboat Sultana* v. *Chapman* (5 Wis. 454), goods consigned to D. & Co., warehousemen, at Milwaukee were shipped on board

a boat at Buffalo, and landed at a pier extending into the lake at Milwaukee, not being the warehouse or place of business of the consignees, and there destroyed by fire, and it was held that in the absence of an established usage of trade to deliver goods in that manner, it was not a delivery to the consignees according to the undertaking of the carrier; and that a particular custom or usage of trade is a question of fact for the jury, and they having passed upon the question under direction of the court below and found against the usage, the appellate court would presume the fact in favor of such finding. In *Dickson* v. *Dunham* (14 Ill. 324), by the contract expressed in the bill of lading, the defendant agreed to transport from the port of Buffalo to the port of Chicago, certain goods, and to deliver them to the plaintiff, who was the consignee, at Chicago, where the plaintiff had a wharf at which he was doing business and where the goods might have been delivered from the propeller; but the defendant also had a wharf, to which his vessel was accustomed to run and where she delivered her freight, and it was held " that by the terms of the contract, in the absence of any usage to the contrary, the captain of the propeller would have been bound to have delivered the goods to the plaintiff at his place of business, if he had one within the port of Chicago accessible and convenient for the vessel, but that it was competent for the defendant to set up a custom or usage in the port of Chicago that goods should be delivered at the wharf selected by the master of the vessel, and that consignees should receive their goods there, with the averment of knowledge of such a custom in the plaintiff, and that this contract was made in accordance with it."

It was said by REDFIELD, J., in *Farmers and Mechanics' Bank* v. *Champlain Trans. Co.* (23 Vt. 312), " that the question as to the time and place where the duty of the carrier ends is one of contract, to be determined by the jury from a consideration of all that was said by the parties at the time of the delivery and acceptance of the goods by the carrier, the course of business, the practice of the carrier, and all other at-

tending circumstances the same as any other contract, in order to determine the intention of the parties."

In *Gatliff* v. *Bowner* (4 Bingham's N. C. 314), TINDAL, C. J., said : " We know of no general rule of law which governs the delivery of a bill of goods under a bill of lading, where such delivery is not expressly in accordance with the terms of the bill of lading, except that it must be a delivery according to the practice usually observed in the port or place of delivery. An issue raised upon an allegation of such a mode of delivery would accommodate itself to the facts of each particular case." In *Gibson* v. *Culver et al.* (17 Wend. 305), it was held that " a common carrier remains liable until the actual delivery of the goods to the consignee, or if the course of business be such that the delivery is not made to the consignee, his liability continues until notice of the arrival of the goods be given. It is competent, however, for the carrier to prove that the uniform usage and course of the business in which he is engaged is to leave goods at the usual stopping place in the towns to which the goods are directed without notice to the consignees, and if such usage be shown of so long continuance, uniformity and notoriety, as to justify a jury to find that it was known to the plaintiff, the carrier will be discharged." In *Salamon Falls Manufacturing Co.* v. *The Bark Tangir* (1 Clifford, 396), CLIFFORD, J., citing Chitty for his authority said : " Where goods arrive by ship from a foreign country, they must be delivered by the master to consignee or his assigns, according to the bill of lading, or at the usual wharf according to the usage of the port of delivery with respect to such voyage." In " *The Boston* " (1 Lowell's Decisions, 464), it was held in the case of a cargo of coal, that in the absence of evidence of usage, where there were two or more wharves in the port equally convenient to the carrier, he was bound to deliver to that most convenient to the shipper, and the learned judge said : " The question is one of delivery in the particular case, and if he has not delivered to the consignee or shipper personally, he must justify his substituted delivery. This he may do by showing the delivery was in accordance

with the terms of his contract, or with the usual course of trade at the port or the course of dealing between the parties." In the case of *The E. H. Fittler* (1 Lowell, 1, 14), the learned judge said: "The question is what are the respective rights and duties of the carrier and the consignees, as to the wharf at which a cargo shall be landed by a general ship. The *dicta* by Mr. Justice BULLER and the other justices, in *Hyde* v. *Trent and Mersey Navigation Company* (5 T. R. 389, 397), are cited in all succeeding books as the foundation of the law upon this subject. A ship trading from one port to another has not the means of carrying the goods on land, and according to the established course of trade, a delivery on the usual wharf is such a delivery as will discharge the carrier." When the case came up for adjudication in England, however, it was decided in the Common Pleas, the Exchequer Chamber, and the House of Lords, that the carrier is bound to deliver to the consignee, and if he intends to rely upon a substituted delivery, he must plead that his delivery was according to the practice and custom usually observed in the port or place of delivery. And the learned judge expressed the opinion that the consignee of goods under a bill of lading, if he is the only person having cargo on board the ship, or all the consignees if numerous, have the right to direct the master to unload at any usual and convenient wharf at the port of discharge, and he held that in the case of a general ship, having the goods of several shippers, the master may, in the absence of usage or custom, proceed to any suitable wharf; but he also said that according to the usage of the port of Boston, the majority of the shippers, that is, those who paid the greater portion of the freight, may choose the wharf. If the defendant had proved such a usage in this case, delivery at the Niagara elevator would have been justified.

These authorities abundantly establish, that in all cases the delivery substituted in place of the actual delivery stipulated in the bill of lading must be in accordance with the usage and custom of the port of delivery, or the course of trade between the parties; and here we repeat it has been

established that the usage at the port of Buffalo, and the course of trade between the parties required the delivery of this wheat to the plaintiffs, and that a majority of the consignees could not control the delivery of their grain. The usage proved is not an unreasonable one. It is not impracticable or unreasonably inconvenient to comply with it. From the fact that the usage or custom exists, we must infer that the convenience of commerce is promoted by delivery as thus required. It may be more expensive to make deliveries in this way than to deliver the whole cargo at one elevator; but we must assume that such expense is taken into account in fixing the rate of freight.

The learned counsel for the appellant contends that a custom, such as is claimed by the plaintiffs, was not found by the trial judge, inasmuch as he uses the language in his finding, of a "general usage," which, it is claimed, is not equivalent to a general custom. But it will be seen by an examination of the cases above cited, and by reference to the elementary works, that the words usage, custom, course of trade are used interchangeably, and it is quite apparent here that the learned judge employed the word "usage" in the sense of "custom." But further, if no usage whatever had been proved, regulating the manner of delivery at the port of Buffalo, the defendant has then not justified this substituted delivery. Both elevators were in the port of Buffalo; both, so far as appears, equally accessible, both convenient and available. How, then, could the defendant justify the placing of the plaintiff's grain in an elevator owned by other parties? This grain was wet and damaged, and required treatment in the drying apparatus contained in the Richmond elevator. It was a reasonable request, therefore, that this grain should be delivered at the plaintiff's elevator, and there was no evidence tending to show a usage or custom which would, in such a case, justify the substituted delivery.

Upon the question, then, of the defendant's liability, we think no error was committed in the court below. But we are of the opinion that the plaintiffs should not have recovered the freight paid. As the case now stands, the defendant has been put to the

expense of carrying and delivering the grain into the Richmond elevator without any compensation whatever. This is certainly unjust and unwarranted. Either the plaintiffs should recover the freight paid only on the ground that that was paid under duress when it was not due to the defendant, or they should recover what it cost them to complete the defendant's contract. We are of the opinion that the latter is the most just and equitable rule. That gives the plaintiffs precisely what they would have had if the contract had been performed as they claim it should have been. They took the grain at the Niagara elevator and paid the entire freight stipulated. They then caused the grain to be carried and placed in the Richmond elevator, and for that incurred an expense of $80.75, and that amount will furnish them a full indemnity for defendant's breach of contract.

The judgment below must, therefore, be modified by striking therefrom $183.66, and the interest thereon, and as thus modified, the judgment should be affirmed, without costs of appeal to either party in this court.

All concur.

Judgment accordingly.