ACME TRANSIT CO. v. 133,000 BUSHELS OF WHEAT.

(District Court, W. D. New York. May 24, 1917.)

No. 1035.

1. SHIPPING ⊚⟶177—CHARTER PARTIES—DUTY OF CHARTERER.
    While the charterer of a vessel, even in the absence of an express agreement to unload with reasonable dispatch, impliedly agrees that the freight shall be unloaded without unreasonable delay and in conformity to the custom and usage of the port, yet, where the charter party or bill of lading or contract of affreightment makes no specific allowance for demurrage, or for any number of lay days for unloading, and specifies no definite time of discharge, the question whether the vessel was unloaded without unreasonable delay depends on the surrounding circumstances.

2. SHIPPING ⊚⟶177—CARRIERS—RISKS.
    The owners of a vessel, who suffered great loss from delay in unloading a cargo of wheat shipped at nearly the close of the navigation season, must be deemed to have assumed the risks incident to transportation at that season, when there was an emergency demand for wheat and the port of destination was overcrowded.

3. SHIPPING ⚙184—CHARTERERS—DUTY OF.

Where a vessel was chartered for the transportation of wheat, and the charter party fixed no time for unloading and provided no lay days, the owner of the vessel cannot, by libeling the wheat, recover damages occasioned by delay in unloading the vessel on the theory that the charterer had a right of action over against a railroad company whose negligence in furnishing cars caused the delay.

4. SHIPPING ⚙171—UNLOADING OF VESSELS—CUSTOM.

Where a bill of lading specified delivery at a certain elevator at port of destination, delivery will ordinarily be made at such port in turn; vessels arriving ahead having precedence.

5. SHIPPING ⚙184—CHARTERER—NEGLIGENCE.

On a libel against a cargo on the ground of negligent delay of the charterer in unloading the vessel, evidence *held* insufficient to establish such negligent delay.

In Admiralty. Libel by the Acme Transit Company against 133,000 bushels of wheat. Libel dismissed.

Goulder, White & Garry, of Cleveland, Ohio, and Brown, Ely & Richards, of Buffalo, N. Y., for libelant.

Stanley & Gidley, of Buffalo, N. Y., for respondent.

HAZEL, District Judge. This is a libel in rem for demurrage. The material facts show that on November 26, 1915, the large freight steamer, Edwin F. Holmes, was chartered by W. A. and A. H. Hawgood of Cleveland, managers, to the Tomlinson Company for transporting wheat from Duluth to Buffalo at the rate of 4½ cents per bushel. The steamer was upbound from Toledo to Duluth at the time, and received orders at the Sault to report at Duluth to the Tomlinson Company, which had previously confirmed the charter party, and had rechartered the vessel to the W. S. Moore Grain Company; the specified shipment to be made during the first five days of December following. The wheat, consisting of 187,000 bushels, was loaded in holds 1, 3, and 4 of the vessel and consigned to W. S. Moore Grain Company, care of C. F. Strasmer, superintendent Connecting Terminal Elevator at Buffalo, with instructions on the bill of lading to notify Otto Stude & Co. of Baltimore, account James Richardson & Son, Kingston, Ontario, to whom the wheat was sold while in transit to Buffalo. Hold No. 2 contained 63,000 bushels of wheat consigned to W. S. Moore Grain Company in care of Lunham & Moore of Buffalo, to be forwarded to Boston.

The steamer arrived early in the morning Sunday, December 5th, at which time there were 39 wheat laden vessels in port, carrying in the aggregate 9,243,000 bushels of grain, awaiting discharge at various elevators—an unusually large number for so near the close of navigation. The evidence shows that 2,000,000 bushels of the grain afloat in the port of Buffalo were consigned to the Connecting Terminal Elevator where the principal cargo of the Holmes was to be unloaded for transportation to Baltimore by the Pennsylvania Railroad, as Strasmer was advised about December 8th. The amount of grain arriving in Buffalo in the autumn of 1915 is said to have exceeded all previous arrivals. This, together with the scarcity of railroad cars for trans-

⚙For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

porting the grain to seaboard points, caused a congestion of the Buffalo grain elevators. It is also fairly shown that there was a scarcity of ocean bottoms and tonnage at Baltimore and at the Pennsylvania Railroad terminals, which made it impossible to relieve the congestion at Buffalo and prevented the expeditious discharge of lake cargoes.

It was customary to unload cargoes in turn at the elevators to which they were consigned. Efforts were made by the trade to expedite unloading, and the managers of elevators and agents of vessels conferred daily as to the best means for remedying the situation; but, as the railroads had stopped transporting grain freely in the early days of December, it was impossible to hurry the unloading.

When the Holmes arrived at Buffalo, the Connecting Terminal Elevator, which was to receive the consignment in question, was loaded to nearly its full capacity, and the Pennsylvania Railroad, which had trackage facilities extending into the elevator, was refusing to supply cars for transportation. Her agent was informed that there were a number of cargoes awaiting unloading at the Connecting Terminal Elevator, and that he was at liberty to unload her at any other elevator in the port. But this was impossible, as other elevators were all more or less crowded, and were refusing to take export grain for transportation over Pennsylvania lines, fearing a scarcity of cars. Vessel agents were made acquainted with changes in the situation at elevators in daily meetings and conferences and by means of bulletins.

The bill of lading in evidence shows that the grain which is the subject of this controversy was to be exported to Greece by way of Baltimore, and there is evidence that it should have reached the seaboard in time for shipment during the latter part of December. Claimant did not learn of the delay until nearly the end of the month. On December 20th, a portion of the cargo was unloaded at the Marine Elevator; but there was further delay, unloading not being completed until January 3, 1916, at the Dakota Elevator. Prior thereto, on December 15th, the cargo was delivered for transportation to the Pennsylvania Railroad, and Mr. Rodgers, the agent of the steamer, accepted the "turn over."

The libel alleges generally that, as the libelant gave notice of the arrival of the grain at Buffalo and of readiness to discharge, the vessel should have been unloaded within a reasonable time, i. e., in about 6 days, and that, as the consignee was aware of the steamer's desire to leave Buffalo before midnight of December 12th (that being the time when marine insurance expired) for Ft. William to take on a storage cargo for delivery the following spring, the burden of finding a place of discharge was upon it; and that in storing grain in her hold during the winter the Holmes would have netted a profit of about $9,475.

An amendment to the libel alleges that there existed at the port a custom of unloading vessels in turn, and that, as there was failure to comply with this custom, the Holmes sustained damages amounting to $100 per day from December 12, 1915, to January 4, 1916, aggregating $1,402.50. The amended answer denied the right to recovery on the ground that the conditions were extraordinary and could not be foreseen, and prevented speedier discharge.

What are the rights of the parties?

The charter and bills of lading in evidence show fairly enough that the grain was a through shipment, as distinguished from a storage cargo, and any doubt there may have been as to this was removed by the evidence. There was some question as to whether the Richardson & Son consignment or the consignment of wheat in hold No. 2 was actually responsible for the delay; but the evidence definitely shows that whatever delay there was, was not attributable to the 63,000 bushels in care of Lunham & Moore for delivery to the Kellogg Elevator.

[1] It is true, as argued by libelant, that the rule of law ordinarily is that the charterer of the vessel, even in the absence of an express agreement to unload with reasonable dispatch, impliedly agrees that the freight shall be unloaded without unreasonable delay and in conformity to the custom and usage of the port. Scrutton on Charter Parties (4th Ed.) p. 244; McArthur Bros. Co. v. 622,714 Feet of Lumber (D. C.) 131 Fed. 389. But this is not a hard and fast rule, and, when it appears that the charter party or bill of lading of contract of affreightment makes no specific allowance for demurrage or for any number of lay days for unloading nor specifies a definite time of discharge, due regard must be given to the particular circumstances contributing to the delay and legitimately bearing thereon. Cross et al. v. Beard, 26 N. Y. 85; The M. S. Bacon v. Erie & Western Transportation Co. (C. C.) 3 Fed. 344; Empire Transportation Co. v. Phila. & R. Coal & Iron Co., 77 Fed. 919, 23 C. C. A. 564, 35 L. R. A. 623.

The original charter and bills of lading in evidence constituting the agreement were in the usual form, and contained no words of limitation as to the time of unloading at the elevator specified therein, and therefore in my opinion whether or not the delay was unreasonable depends entirely upon the circumstances existing when the vessel arrived in port. The clogging of the elevators because of failure on the part of the railroad companies to supply cars is an element to be considered in placing responsibility for the delay.

[2] Although libelant sustained severe financial loss from delay in unloading, it must be deemed to have assumed risks incident to transportation at nearly the close of navigation, and when there existed an emergency due no doubt to demands for wheat arising out of European war conditions. The existing circumstances are controlling upon both parties, and both are required to exercise reasonable care and precaution to prevent delay. This rule was, I think, fully stated in Fulton v. Blake, Fed. Cas. No. 5,153, and again later in the case reported at 77 Fed. 919, 23 C. C. A. 564, 35 L. R. A. 623, where the responsibilities arising from charters are ably discussed.

[3] Libelant has pointed out that several vessels arriving in port after the Holmes were unloaded ahead of her, but in each instance this was due to the size of the cargo which permitted putting it in certain spare places in the elevators, and fails to show want of diligence and care on the part of the consignees in securing facilities for unloading. In fact, the Holmes, owing to the depth of her draft, was able to go to only certain of the elevators.

There was some testimony of movements of cars over railroads other than the Pennsylvania line, Mr. Williamson testifying that other railroads "acted pretty fair" and "took care of us," and libelant insists that the Pennsylvania Railroad broke its contract with the consignee, which has its·right of redress for the breach, while the vessel must proceed against the grain itself. But to hold that the claimant of the grain should enforce a problematical liability against the railroad·company and permit libelant to enforce a lien on the grain in rem for demurrage or warehousing would not in my opinion be a just disposition of the controversy, in view of the fact that libelant has not proven that the owner of the grain did not exercise reasonable diligence to discharge the vessel, and, besides, it could have protected itself by a contract definitely fixing the time of unloading or by providing for lay days. Riley v. 3,000 Railroad Ties (D. C.) 38 Fed. 254. Indeed, it possessed better facilities for learning the condition of the port than Richardson & Son who bought the cargo afloat.

[4] As the bill of lading specified delivery at a certain elevator which had connections with the Pennsylvania line, delivery would ordinarily have to be made at such place in turn; vessels arriving ahead having precedence. Such was the holding by Circuit Judge Coxe, then sitting in this district as district judge, in The J. E. Owen (D. C.) 54 Fed. 185. There, it is true, the court pointed out in the opinion that no demand had been made upon the consignees to furnish another elevator, and the implication might be drawn that, if such a demand had been made of the consignees in this case, they would be liable for any delay occurring thereafter.

[5] Mr. Rodgers testified substantially that, if the Holmes had promptly taken the shipment to another elevator, and if arrangement had been made to divert an equal amount of grain to another railroad, it would have been possible to unload the vessel more promptly; but I am in doubt as to whether there could have been a diversion from the Pennsylvania line after December 15th, when the cargo was delivered to the Pennsylvania for shipment, without damage to the owner of the grain. There is no authority for declaring that a contract for affreightment to unload at a certain railroad line puts upon the consignee or shipper the burden of changing the contract to facilitate unloading the vessel. While emergencies may arise, and indeed have arisen herein, which oblige both parties to adapt themselves to circumstances so as to minimize possible damage to either, I nevertheless think that nothing has been adduced to substantiate the amendment to the libel or the negligence of the consignee in not using diligence to discharge the vessel in view of the circumstances (Riley v. A Cargo of Iron Pipes [D. C.] 40 Fed. 605; The J. E. Owen, supra; Williscroft v. Cargo of Cyrenian [D. C.] 123 Fed. 169), or that this delay in discharging the vessel was unreasonable in view of the extraordinary conditions.

It would, of course, be difficult to determine that the owner of the grain had exercised reasonable diligence in discharging the vessel if there was evidence of a willingness on the part of other elevators to take the grain, or on the part of other railroads to transport it at the

same tariff rate to Baltimore in time for shipment to Greece, its ultimate destination; but the evidence shows that the consignee apprised the vessel of his willingness to have her unload at any other elevator, giving her, as it were, the freedom of the port; but no other elevator would receive the cargo, owing to the uncertainty, as testified by Mr. Smith, who was thoroughly acquainted with transportation conditions, of obtaining cars at their terminals not alone on the Pennsylvania line but also on other railroad lines.

Under the circumstances evidenced herein, there is no justification for making an exception to the rule that the carrying vessel, failing to provide for demurrage or to limit the lay days, cannot recover loss of profits or damages sustained by detention. The libel is dismissed, with costs.