## OTTAWA TRANSIT CO. v. 261,000 BUSHELS OF WHEAT.

(District Court, W. D. New York. June 9, 1919.)

No. 1049.

1. SHIPPING ⟨⟩174—CONSIGNEE'S LIABILITY FOR UNREASONABLE DELAY IN DISCHARGE OF VESSEL.

The consignee of a grain cargo, required to unload the vessel, is bound to exercise due diligence under the circumstances and the custom of the port to discharge the vessel as speedily as possible and is liable for her unreasonable detention.

2. SHIPPING ⟨⟩184—IN ACTION FOR NEGLIGENT DETENTION OF VESSEL BY CONSIGNEE BURDEN IS ON LIBELANT.

In a suit against a consignee to recover for delay in discharging, the burden is on libelant to establish negligent detention beyond the time when, under the custom of the port the vessel would ordinarily be unloaded, but respondent may show special circumstances excusing the delay.

3. SHIPPING ⟨⟩177—CONSIGNEE LIABLE WHERE DELAY CAUSED BY HIS NEGLIGENCE.

Consignee of an export cargo of wheat held liable for detention of the vessel for discharging, where her turn, under the custom of the port, came seven days before she was actually discharged, and the delay was because consignee made no effort to obtain cars for reshipment and in consequence the elevators would not receive the wheat.

In Admiralty. Suit by the Ottawa Transit Company, owner of the steamer Normania, against 261,000 Bushels of Wheat, ex cargo of the steamer; the Norris Grain Company, claimant. Decree for libelant.

Goulder, White & Garry, of Cleveland, Ohio, and Brown, Ely & Richards, of Buffalo, N. Y. (Harvey D. Goulder, of Cleveland, Ohio, and John B. Richards, of Buffalo, N. Y., of counsel), for libelant.

Clinton, Clinton & Striker, of Buffalo, N. Y., for claimant and respondent.

HAZEL, District Judge. This is a proceeding in rem to recover damages for unreasonable delay in unloading the freight steamer Normania of her export cargo of grain, consisting of approximately 261,000 bushels. The Normania arrived at Buffalo May 6, 1916, at 8 o'clock in the evening, and on the next day consignee's agent, as is customary, was immediately notified by the vessel's agent that the vessel was ready to unload; but unloading did not begin until May 13th when 44,000 bushels only of the grain were taken from the steamer's hold, the balance of the cargo being unloaded May 19th, at 7:40 in the morning.

The libel originally pleaded that under the agreement the carrying steamer was entitled to a stipulated sum for detention beyond four days; but this allegation was not insisted upon at the hearing, and the trial proceeded upon another allegation, namely, that the claimant, Norris Grain Company, was required to discharge the cargo within a reasonable time after the steamer's arrival and notice of delivery or

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

readiness to discharge, in accordance with the custom of the port, and that its failure so to do was negligence on its part. The answer set forth that other vessels had arrived in port ahead of the Normania, that the custom was to unload the grain at elevators, and that because of continued congestion at the elevators the claimant was unable to procure prompt discharge of the cargo in question. It was also stated that all possible effort was made to secure an earlier discharge, and that under the custom of the port the consignee was entitled to a reasonable time for discharging, depending upon the facilities of the port. Accordingly the issue presented is whether due diligence was exercised by the consignee in the discharge of the grain consigned in care of Mr. Strassmer, agent for the Connecting Terminal Elevator at Buffalo, who was to procure an elevator for unloading and to arrange for rail shipment to the seaboard.

[1, 2] In the notice of arrival by the agents of the steamer to Mr. Strassmer, the designation of an elevator was requested, but nothing was done until May 7th, when, as heretofore stated, a portion of the grain was unloaded at the Connecting Terminal Elevator, while the final unloading was at the Export Elevator. The rule of law applicable here is unlike that applied in cases of demurrage, wherein the charter party establishes the rights of the parties, but to exonerate from liability for detention it must be shown that under the circumstances due diligence was exercised to unload the vessel so as not to detain her unreasonably. The consignee was required to furnish the place of unloading to discharge as speedily as possible after notice of arrival, and to conform to the usage of the port in relation thereto, or suffer damages for delaying the carrying vessel. Fulton v. Blake, Fed. Cas. No. 5153; Williscroft v. Cyrenian (D. C.) 123 Fed. 169. With this rule the parties are in agreement; the difference between them arising over the question of whether the libelant was required to establish negligent detention beyond the time when, under the custom of the port, the steamer would ordinarily be unloaded, or whether the burden of proof rested upon claimant to show reasonable dispatch in so doing.

Libelant, to recover, must prove negligence. The burden of proof can scarcely be said to shift though claimant in view of the circumstances may justify its conduct or apparent negligence in detaining the steamer. The rule is stated in Heinemann v. Heard, 62 N. Y. 455, and in Cowen Co. v. Houck Mfg. Co., 249 Fed. 285, 161 C. C. A. 293, that during the progress of the trial the burden does not ordinarily shift from plaintiff to defendant, even though the prima facie case may require countervailing testimony of a substantial character to prevent recovery on a prima facie case.

[3] Did the circumstances excuse the claimant from responsibility for the delay in unloading? It is true that from April 25th to May 6th, inclusive, 104 vessels carrying and transporting grain arrived in port, and there no doubt was congestion in the elevators at the time of the arrival of the Normania; such congestion continuing for several days. The custom of the port entitled vessels to be unloaded at the

elevators in turn, those first arriving at the break wall having the right to discharge ahead of later arrivals. While there were a number of vessels ahead of the Normania waiting their turn to unload on May 6th, when she came into the river, yet all were discharged by May 12th; and it is shown that 55 grain carrying vessels arriving after the Normania were unloaded before May 19th. While they all suffered delay, some as much as six days and ten hours, none was detained as long as the Normania. If the Normania had been unloaded in turn, she would no doubt have been discharged not later than May 13th.

The consignee's agent, Mr. Strassmer, attributed the delay, or the greater portion thereof, to congestion of the elevators, but this view is unacceptable, since it appears that later arrivals were unloaded ahead in violation of the rules of the port. He testified, true enough, that between May 16th and 17th he at various times inquired at elevators for space, but that space was denied him, where reasons for doing so were assigned on the ground that the elevators were full. But this, as will appear presently, was not the actual reason for rejection.

Why, then, was the Normania delayed in unloading? Any conges-' tion there may have been at the elevators on her arrival concededly did not continue during the entire time of her detention. There is testimony showing that reluctance on the part of the elevators to receive the cargo was due to the fact that no arrangement had been made for transporting it to the seaboard. Because of the war, an unusually large amount of grain was moving through the port of Buffalo at this time with great celerity, the custom being to elevate it from carrying vessels, and almost immediately to release from the elevator an equal amount to be placed on waiting cars for transportation to the seaboard. These in the main were continuous operations, necessitating a constant demand for elevator space, and none of the elevators was desirous of taking into storage such a large quantity of export grain as the Normania had aboard without some assurance as to when it would be relieved of a similar amount. To receive it and store it for any length of time would have seriously interfered with the movement of grain to and from the terminal elevators.

Mr. Rogers, a representative of the vessel, upon the consignee's failure to secure elevator space, made inquiries and learned that none of the elevators would accept the cargo without shipping orders. That such was the fact is not disputed. Upon receiving instructions from the owner of the grain on the night of May 16th, the Export Elevator immediately unloaded the cargo. Presumably if earlier efforts had been made to procure transportation, rail booking at least would have been obtained, and the unreasonable detention of the steamer avoided.

It makes no difference that the Normania's cargo was consigned to a representative of the Pennsylvania Railroad, with the possible expectation that he would furnish cars for forwarding the grain. There was no contract provision for forwarding the grain via the Pennsylvania Railroad to the seaboard. Nor could claimant be relieved from responsibility by notifying the vessel agent to take the "freedom of the port," or procure a place for discharging the cargo. The obligation or duty to furnish such a place was primarily upon the consignee and

the liability arising from failure to exercise reasonable diligence to provide a suitable place for unloading, after notice of arrival, and within the time prescribed by the custom of the port, could not be limited by suggesting that the vessel obtain the unloading facilities.

Importance was attached by proctor for claimant to the existence of a car shortage at Buffalo, at that time on all the railroad lines, which it was alleged made it impossible earlier to transport the grain; but this did not, as contended by libelant, prevent the consignee from making a rail booking, or at least endeavoring to do so. If the elevators had been advised of the probable time of shipment, they could easily have determined whether the cargo would have to be held by them beyond a reasonable time. Nothing whatever was done to procure bookings, and indeed the consignee was without authority to procure transportation. Therefore, I am unable to escape the conclusion that the libelant has fairly established that there was a lack of diligence on the claimant's part which caused the unreasonable detention of the carrying vessel from May 12, 1916 (the date when the steamship Bixby, which arrived only about three hours ahead of the Normania, was unloaded) to May 19th at 7:40 a. m., the time of unloading the Normania. Decree for libelant, with costs, and reference to a commissioner to ascertain the damages.