## THE G. A. TOMLINSON.

### (District Court, W. D. New York. August 1, 1923.)

1. **Shipping ⬳113—Charterer's bill of lading held to bind ship to make right delivery.**

   Where the master of a vessel on the Great Lakes receives on board a cargo of grain loaded by the charterer, he is presumed to know that the charterer in due course will issue bills of lading, and the ship is bound to make right delivery in accordance with such bills of lading.

2. **Shipping ⬳117—Ship required to discharge at place designated by bill of lading or consignee.**

   By the prevailing custom at Buffalo, a ship bringing a cargo of grain is required to unload at the particular place designated in the bill of lading, or, if not so designated, at the place named by the consignee.

3. **Shipping ⬳132(5)—Ship held not excused from making right delivery of cargo.**

   Evidence *held* not to sustain the claim of a ship that it was excused from making delivery of a cargo of barley at the elevator designated in the bill of lading, because it was not a safe place to reach and lie in discharging.

In Admiralty. Suit by the Fleischmann Malting Company against the steamer G. A. Tomlinson; the Pioneer Steamship Company, claimant. Decree for libelant.

Brown, Ely & Richards, of Buffalo, N. Y. (John B. Richards and David S. Jackson, both of Buffalo, N. Y., of counsel), for libelant.

Holding, Masten, Duncan & Leckie, of Cleveland, Ohio, for respondent and claimant.

HAZEL, District Judge. On July 21, 1921, the libelant, the Fleischmann Malting Company, at Duluth, shipped 96,000 bushels of barley aboard the steamship G. A. Tomlinson, consigned for delivery, as appears by the bill of lading, at Buffalo, to the order of libelant, care "Exchange Elevator, notify Fleischmann Malting Company." On the arrival of the freighter at Buffalo, her owner, the Pioneer Steamship Company, refused to deliver the barley to the Exchange elevator, in whose care it was shipped, though requested so to do by libelant, on the ground that it was not a safe place to unload, and also that the bills of lading were made with the Tomlinson Company, a separate corporation, and charterer of the steamship, and not with the steamship, or her master, agent, or owner. The barley was afterwards unladen at the Great Eastern elevator at Buffalo over libelant's protest.

The basis for the libels is that there was a misdelivery of the barley. In the first cause of action a recovery is sought for the amount expended and incurred for transferring the barley from the Great Eastern elevator to lighters and thence to the Exchange elevator, and also for freight money exacted and paid as a condition of releasing the grain to the owner. The second cause of action is limited to recovery of freight money paid without including the expense of lightering or transfer of the grain to the Exchange elevator.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Exceptions to the libel were filed on the ground that no maritime lien enforceable in rem existed for failure to make right delivery. The exceptions were overruled. See The G. A. Tomlinson (D. C.) 279 Fed. 786.

The evidence shows that on June 17, 1921, the Tomlinson Company chartered the steamer Tomlinson on a written contract, and by its provisions it had the right to load aboard the steamship for transportation not less than the equivalent of 175,000 bushels of wheat at Duluth and Superior, consigned to Buffalo; the rate of freight being 1¾ cents per bushel wheat basis.

On July 31st two bills of lading were issued by the charterer signed, "The Tomlinson Company, Agents," requiring the grain to be delivered to the order of "the Fleischmann Malting Company, care of Exchange Elevator, Buffalo, N. Y., notify Fleischmann Malting Company." The question for decision now is whether the charter party bound the steamship to make delivery at the Exchange elevator, the care party specified in the bills of lading, on the theory that there was acceptance of the grain by the master of the steamer, and that the contract of affreightment as to its transportation was governed and controlled by the bill of lading. It is denied that there was acceptance of the grain, or that the issuance of the bill of lading to libelant by the charterer bound the ship to deliver the cargo at the Exchange elevator.

[1] On arrival of the steamer at Buffalo, libelant, upon being notified, demanded that the vessel unload the cargo at the place specified in the bills of lading. Claimant, however, refused, on the ground that it was unsafe and hazardous for the Tomlinson, or a vessel of her size, to do so. The fact that the bills of lading were issued by the charterer, instead of by the steamship, does not, in my opinion, relieve the personified ship from liability for failure to make right delivery of the cargo. Her master, at Duluth, accepted the cargo over the rail of the ship, and it is not of material importance per se that he personally was unaware of the unloading conditions. It may safely be held as a matter of law that he is presumed to have known that the charterer in due course, as agent for the ship, would issue bills of lading for shipments of grain, which after it was taken aboard became subject to maritime liens. The Poznan (D. C.) 276 Fed. 418; The Blandon (D. C.) 287 Fed. 722. I think the steamship, in view of the circumstances, was bound by the contract of affreightment entered into by her charterer, and delivery at the Exchange elevator of the grain was required, unless unloading there imperiled the safety of the vessel. It makes no difference that the master did not sign or issue the bills of lading, for on the Great Lakes they are customarily signed by vessel agencies only, and, being laden, she was required to make right delivery, though bills of lading were signed by the charterer. The Esrom (C. C. A.) 272 Fed. 266. The conversation between the witness Houghton and Mr. Bye, tending to limit or qualify the conditions of delivery, cannot be given weight to vary or modify the contract. Vanderbilt v. Ocean S. S. Co., 215 Fed. 886, 132 C. C. A. 226. The principle governing the liability of a vessel, where the contract of carriage was not signed by the master, is thus well stated by Judge Manton in The Esrom, writing for the Circuit Court of Appeals:

"If the voyage is begun, the vessel must carry the goods to destination on the terms agreed by the shipper with the charterer; for, when the vessel starts upon the voyage, by implication there is a ratification and adoption by the ship of the charterer's contract with the shipper. Then the shipper is deprived of an opportunity to retake his goods, and the goods are in the sole possession and control of the ship. So, too, the ship is then bound by the charterer's bill of lading, under which the freight is prepaid, and cannot collect further freight at destination. The Ada (D. C.) 233 Fed. 325. Before sailing, the vessel owner is protected by his opportunity to refuse to carry the goods on the terms agreed by the charterer before the voyage is commenced."

[2] Claimant cannot prevail in its assertion that the contract was limited to delivery of the grain at Buffalo, regardless of the particular place of unloading specified in the bills of lading, since a fair preponderance of the evidence establishes that ordinarily bills of lading provide for unloading either at a particular elevator or the notify party designates the elevator when the steamer arrives in port. It is not proven that usage and custom at Buffalo requires a special contract for unloading at a particular elevator. The prevailing custom, even when no care party is specified, according to the evidence, is for the consignee or owner of grain, on arrival, to designate a suitable elevator for unloading. Acme Transit Co. v. 133,000 Bushels of Wheat (D. C.) 243 Fed. 970; Ottawa Transit Co. v. 261,000 Bushels of Wheat (D. C.) 260 Fed. 494; Richmond v. Union Steamboat Co., 87 N. Y. 240.

[3] Claimant, however, contends that the Exchange elevator was an unsafe place for the vessel to go, and consequently she was excused from doing so. There was much testimony on both sides upon this point. The Tomlinson is a large-size freighter, 525 feet long and 54 feet wide, and the testimony of risk and hazard of navigating the channel leading to the Exchange elevator is to the effect that the steamer's draft of 16 feet, with 96,000 bushels of barley aboard in her forward holds, would involve stranding. The affirmative testimony in relation to the unsafety of the channel and that in opposition has been carefully considered. The testimony, however, of the assistant New York state engineer, who supervised the widening and deepening of the channel and the subsequent sweeping of the bottom in June, 1921, and of other witnesses giving corroborative testimony, convinces me that the Tomlinson, if carefully and skillfully navigated by her skipper, would not have sustained any difficulty, hazard, or risk in unloading at the Exchange elevator.

The evidence shows that between the years 1914 and 1919, at great expense, the state of New York widened and deepened the Erie Basin for the express purpose of making it navigable for all large-size vessels on the lakes, including vessels of the length, beam, and draft of the Tomlinson. The Erie Basin in the autumn of 1919, according to the proofs, was dredged to a depth of 23 feet. It was raked and swept to clear the débris from the channel. Its width at different points was from 150 to 500 feet, while the normal depth over stones lodged in the bottom was 20 feet. Opposite the Exchange elevator the channel was approximately 150 feet wide, and at all points in the channeled area (Map, Exhibit 19) the water was fully 20 feet deep. The current of ¾ of a mile per hour was not disturbing and no riprap or obstructions

extended into the channel to interfere with proper navigation. Accordingly, I find from the evidence that there was ample space and depth for the Tomlinson, at the time in question, to make the turn from the government channel into the Erie Basin, and thence proceed to the place designated for unloading. It is shown that other vessels of approximately the size and loaded draft of the steamer Tomlinson have safely navigated in the channel to the Exchange elevator, and have not regarded that doing so involved any hazard or risk of danger.

Although various navigators have testified for claimant that in their opinion a steamer of the size of the Tomlinson and loaded to a depth of 16 feet involved danger, yet such testimony is based in the main upon opinion evidence, which the actual condition of the channel in my opinion negatives. Nor was there danger of the steamship grounding on a ledge or projection on the side of the Exchange elevator dock, for fenders were properly placed in June, 1921, which it is believed would have prevented her, if properly maneuvered, from coming in contact. It is true that Capt. Parsons' opinion was based on his personal experience in taking his steamer, the Durston, in December, 1922, to the dock. His boat at the time was drawing 16 feet 3 inches, and while there, in consequence of a severe December gale, blowing approximately 75 miles per hour, she was forced on the ledge by her bilge and rested there. The severity of the gale had lowered the water 2 feet 6 inches, but on subsiding the steamer floated free without sustaining injury. At this time there were no floating fenders in position, while in June, 1921, three floating fenders, 24 inches by 24 inches, one 40 feet long and the remainder 20 feet long, afforded protection from contact. The witness' experience, therefore, does not indicate unsafety to the Tomlinson. Other narrated experiences are likewise subject to explanation and qualification, and to me are unpersuasive of any risk or hazard in unloading at the dock, provided, of course, ordinary care was exercised by assisting tugs and steamer.

My conclusion in this relation is that the Exchange elevator was a safe place for unloading the cargo in question, that libelant is entitled to recover for its failure to make right delivery under the contract of transportation and acceptance of the cargo by the steamship.

Decree for libelant, with costs.

⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes