## THE ADA.

### (District Court, D. Maryland. May 5, 1916.)

SHIPPING ☞49(2)—FREIGHT—CONTRACT OF AFFREIGHTMENT.

    A subcharterer of a steamship, which had agreed to prepay a lump sum as freight for the carriage of a cargo, became bankrupt before the ship was fully loaded. It had accepted and loaded a shipment for libelant at an agreed freight, for which libelant had given a check, but upon which it stopped payment on the bankruptcy. Libelant tendered prepayment to the ship at the agreed rate, which was refused, and libelant refused to pay more. The ship remained in port for several days, and then sailed with the shipment on board, and at the port of destination enforced payment of the freight at a higher rate. *Held,* that, by failing to discharge the shipment at the port of loading after knowledge of the contract under which it was loaded and of libelant's refusal to pay a higher rate of freight, it became bound by such contract, and was liable to libelant for the excess collected.

    [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 193; Dec. Dig. ☞49(2).]

In Admiralty. Suit by the Union Petroleum Company against the Swedish steamship Ada. Decree for libelant.

Conlen, Brinton & Acker, of Philadelphia, Pa., and Daniel H. Hayne, of Baltimore, Md., for libelant.

Engel Bros., of New York City, and Harry N. Abercrombie, of Baltimore, Md., for respondent.

ROSE, District Judge. Four hundred barrels of oil belonging to the libelant, a Delaware corporation, were carried by the Swedish steamship Ada from the port of New York to Marseilles. At the latter port the freight demanded by the steamship, viz., $1,639.45, was paid under protest; the libelant claiming that such sum was $374.88 more than the steamship was entitled to demand. The libelant also seeks to recover $37.64 for various expenses for cablegrams, etc., resulting, as it alleges, from the excessive demand made by the steamship.

There is no dispute as to facts. On the 29th of July, 1915, the libelant entered into a contract with the Inter-Ocean Transportation Company of America, Incorporated, by which the latter undertook to transport for the libelant the oil in question, from New York to Marseilles, for the sum of $1,264.59. At the time the contract was made the parties expected it to be fulfilled by the shipment of the oil on a steamer in no wise connected with the respondent or its owners. For some reasons such shipment was not made on such other steamer. The Ada, during all the time in which the transactions in controversy took place, was under a time charter to one Robert F. Monahan. On the 3d of September he made a subcharter to the Inter-Ocean Transportation Company of America, Incorporated, by which the latter agreed to supply a full and complete cargo of general merchandise to the Ada for the lump sum of $37,500, which was to be paid directly to the owners of the ship upon the issuance of the bills of lading, or

to the authorized agent of the ship upon signed bills of lading signed by the captain; such bills of lading to constitute a lien upon the ship, the amount of prepaid freight to be and remain a lien against the cargo until the freight was paid, according to the charter party. After making such subcharter, and before September 16, 1915, the Inter-Ocean Transportation Company of America, Incorporated, with the consent of the libelant, loaded the 400 barrels, of oil in question upon the Ada; the libelant accepting that steamship in lieu of the Astoria, under its agreement of July 29, 1915.

On the 16th of September, 1915, the libelant gave the Inter-Ocean Company its check for $1,264.59, in full payment of the freight, receiving therefor a bill of lading for the 400 barrels of oil, signed by an employé of the Inter-Ocean Company, but not by the owners, master, or charterers of the Ada. Four days before such payment of freight and signing of bills of lading, Monahan demanded of the Inter-Ocean Company the payment of $37,500, and offered upon payment of such sum to deliver to the Inter-Ocean Company bills of lading for cargo, and on September 16th, the very day on which such check was given by the libelant to the Inter-Ocean Company, Monahan notified libelant in writing that the Ada would sail the next day, and the owner and master of the ship would be at the office of Monahan's attorneys in New York at 10 o'clock in the forenoon of such day, ready to sign and deliver bills of lading for the shipment. The notice stated that all freight was to be prepaid, and asked that the shipper be good enough, when he called for bills of lading, to bring with him check to cover freight.

On the 17th of September a petition in bankruptcy was filed against the Inter-Ocean Company, and on that day libelant stopped payment on the check for $1,264.59, theretofore given to the Inter-Ocean Company. The loading of the Ada was completed by Monahan, the charterer; the Inter-Ocean Company having left it unfinished. On the 17th of September, the Ada left her berth and went to anchorage in New York Harbor. Thereafter, and before her sailing on the 23d of September, the libelant more than once tendered Monahan $1,264.-59. He declined to receive this sum, demanding more. The oil was duly carried to Marseilles, and there delivered upon payment, under protest, as already stated, of the sum of $1,639.45.

Libelant claims that, the Inter-Ocean Company being duly authorized by the ship to accept cargo for shipment upon it, the ship is bound by the agreements made by the Inter-Ocean Company with reference to such cargo as was actually placed on board the steamship, with the consent of the master, irrespective of whether the Inter-Ocean Company performed its agreement with the steamship or with Monahan, its charterer.

The ship's view is that no bills of lading were ever signed by its master, and that by the terms of the charter party none were to be signed by him until the lump sum due from the Inter-Ocean Company was fully paid. It relies on Gracie v. Palmer, 8 Wheat. 605, 5 L. Ed. 696, to sustain the contention that in such a case the shipper was put upon inquiry as to whether there was a, charter, and, if so, what were its terms and conditions, and upon Ralli v. Paddington Steamship

Company, 5 Times Commercial Cases, 125, in which some of the facts were quite similar to those at bar.

The libelant cites many authorities for the contention that a charterer in possession of the vessel may bind it to the cargo received on board. I do not think it necessary in this case to go into any discussion of such questions. Before the ship sailed it knew that the libelant had never promised to pay more than $1,264.59, and that it was not willing to pay more. It is true that it did not demand that its goods be returned to it, but it reiterated its refusal to pay a higher price. Under such circumstances the ship, if it was not willing to carry the cargo at the only rate to which libelant ever agreed, should have discharged it. There is nothing in the agreed statement of facts to show that such discharge would be impracticable. The ship could not make a contract with libelant to which libelant had never consented.

It follows that the libelant may have a decree for the amount claimed.