### THE BLANDON.

(District Court, S. D. New York. March 16, 1922. Supplemental Opinion March 30, 1922.)

1. **Shipping ☞108—Oral contract of charterer does not bind ship.**
   Oral contract of time charterer to carry a cargo does not bind the ship, but the only contract which does is the bill of lading of its master, or of some other duly authorized agent of the owner.

2. **Shipping ☞106—Master of chartered vessel ratifies all bills of lading signed by charterer when he sets sail.**
   Where vessel is under a time charter, the master ratifies all bills of lading signed by the time charterer when he sets sail, and thereafter such bill of lading is the measure of the ship's duty and the cargo's "privilege"; but such ratification does not extend to oral contracts of carriage made by the charterer personally.

3. **Shipping ☞125—War deviation clause held not to excuse deviation not caused by war conditions.**
   An article in a bill of lading, that "in view of war conditions" vessel was at liberty to deviate in the course of the voyage, *held* to excuse only deviations occasioned by war conditions.

#### Supplemental Opinion.

4. **Shipping ☞125—Clause in bill of lading held to allow reasonable deviation.**
   A clause in a bill of lading for a mixed cargo, "with the liberty to call at any port or ports in or out of the customary route in any order," *held* to excuse deviation, consisting of a stop at a place some 30 hours away from the port of departure for the purpose of making up a cargo, but not to excuse a return to the port of departure, as the voyage, once started, should have been continuous.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Libel against steamship Blandon, her tackle, etc. Decree for libelant.

Herbert Green, of New York City, for libelant.
Robert S. Erskine, of New York City, for claimant.
Horace Gray, of New York City, for The Blandon.

LEARNED HAND, District Judge. This ship left New York on May 11, 1919, bound for Philadelphia, to complete her loading. There she remained till May 19th, when she returned to New York and continued loading till May 26th. Eventually she cleared from New York May 31st, but upon putting out she found herself in unseaworthy condition from bad stowage and leaky boilers, and put back on June 1st for repairs and to retrim the ship. She remained in New York, making repairs and retrimming, till June 15th, when she finally cleared for Valencia, where she arrived on July 5, 1919. The libel is in rem, and was filed on May 6, 1919. It charges that the Triangle Steamship Company for the vessel had agreed to sail direct for Valencia and to stow the cargo in the 'tween-decks; that it was proposed to sail to Philadelphia and Norfolk to complete the lading. The charge of bad stowage was withdrawn, and the libelant therefore rests on the claim of deviation.

[1] The libelant proved an oral contract with the Triangle Steamship Company to carry a cargo of nitrates on the Blandon, which should leave no later than May 5th, so as to fulfill certain contracts made by the libelant for their sale before the end of May. Upon this contract a decree might go against the Triangle Steamship Company in personam, except that that company was not named as a party respondent, and, being in bankruptcy anyway, any claim against it should be filed with the referee. This is a libel against the ship, of which the Triangle Steamship Company was a time charterer from the United States Shipping Board Emergency Fleet Corporation. The oral contract of the charterer in such a case does not bind the ship. The Owego, 270 Fed. 967 (C. C. A. 2d). The only contract which does is the bill of lading of its master, or of some other duly authorized agent of the owner.

[2] In the case at bar the master did not sign, but the time charterer, and although it was held in The Esrom (C. C. A.) 272 Fed. 266, at page 271, that in such case the ship is not bound for a delay before breaking ground, it was specifically said that the master must be held to ratify all bills of lading once he sets sail. Indeed, this is a necessary conclusion, because the master must know at that time, if he has not himself signed any bills of lading, that the charterer has done so, and to sail is to accept those outstanding. Besides, were it not so, there would be no means of ascertaining the measure of the ship's acknowledged obligation. The Esrom, supra, was a case involving a voyage charter, and, as Judge Manton held, it was possible in such a case to look to the charter for the ship's duty. But this is not possible in a time charter, where the destination is not described. Nor is it possible to look to the maritime law for a definition of the cargo's maritime "privilege," though its incidents may be fixed by

the law itself. Whatever, therefore, may be the rule before the ship breaks ground, it seems to me clear that thereafter the bill of lading, though signed by the charterer only, is the measure of the ship's duty and the cargo's "privilege."

[3] Now, the ship has the right to a reasonable time to lade, and it does not follow that this time was up when she cleared for Philadelphia. In so clearing, however, she committed a deviation for which she must show some excuse. Even though she had more time in which to lift a full cargo, she had no right to pick it up along the coast, now here, now there. The voyage to Philadelphia was therefore a clean breach, and must be excused.

Excuse is offered in the twenty-second article of the bill of lading, which reads as follows:

"22. In view of war conditions, vessel has liberty to proceed via any route to destination, and to deviate in the course of the voyage or to remain in port, as master may deem best in his judgment. Owing to conditions of war, or hostilities existing or threatened, this shipment is to be accepted at the sole risk of the owners thereof, of arrest, restraint, capture, seizure, detention, or interference of any sort, by any power; and the carrier and its representatives are privileged in its or their absolute discretion, if deemed advisable for the protection of the vessel or any cargo, or to avoid loss, damage, or delay, expense, or other disadvantage of danger, either with or without proceeding to or toward the port of discharge, or entering or attempting to enter or discharge the goods there, and whether such entry or discharge be permitted or not, to proceed to any other port or ports, or return to the port of shipment, once or oftener, in any order or rotation, retaining the goods on board or discharging the same at risk and expense of the owners thereof at any such port or ports at the first or any subsequent call, and full bill of lading freight, together with extra compensation for additional transportation and all other charges shall be paid by the shipper, consignee, and/or assigns, and shall be a lien on the goods."

It is clear that only the first sentence of this is applicable, as to which it is also clear that the excuse extends only to deviations occasioned by war conditions. The trip to Philadelphia was in no sense one of these; it was to complete the lading of a cargo which should have been laden in New York and within a reasonable time. The master had, indeed, the widest discretion to deviate for any reason connected with the war; but a clause like this, among the many hidden upon the back of a bill of lading, will not be an excuse for deliberate deviations not arising from the conditions, to which only it was meant to apply.

I hold, therefore, that the Blandon committed a breach of the bill of lading by a deviation on May 11, 1919, for which she is liable in rem. The damages for that breach will be such as the libelant has suffered from the failure to perform the bill of lading, not the oral contract with the Triangle Steamship Company. Had she fulfilled her contract, she would have sailed direct to Valencia at the end of a reasonable time to lift her cargo at New York. This date the commissioner will find on the assumption that the cargo was ready to lift, because the shipper is not to be bound to an indefinite delay while the charterer looks about to gather his cargo. The time of the voyage I take at 20 days, and thus the time of her arrival at Valencia can be estimated, had she not deviated. Nor can any allowance be made for

the time at which she was refitting and retrimming in New York
That was consumed because she was not seaworthy, because of the
condition of her boilers, and because the stowage had been improper.
The stowage not only put her by the head, but broke her steering
gear. It was not done with due diligence. The shipper was entitled
to a seaworthy ship, and cannot be charged with the delays necessary
to make her so.

The damages will therefore be the difference in market price be-
tween the nitrates at the putative date of arrival and on July 5, 1919,
when she in fact delivered them. In ascertaining these damages, the
commissioner will not only disregard the date fixed in the oral con-
tract with the Triangle Steamship Company, but any special damages
arising from the libelant's failure to perform the contract of sale which
he made with the Spanish buyers.

Interlocutory decree of reference before Henry E. Mattison, Esq.

### Supplemental Opinion.

[4] In my earlier decision I neglected to observe the clause in the
main body of the bill of lading; that point not being argued at the
hearing or in the briefs. It is this:

"With the liberty to call at any port or ports in or out of the customary
route in any order."

The question is whether this clause justified the ship in calling at
Philadelphia, a deviation which I have held to have been otherwise
unjustified. If these words are to mean anything at all, it seems to
me that they must include such a stop as Philadelphia. True, it was
not a stop on the customary route; at least, I must assume so on
this record. Yet it was expressly agreed that the port might be "out
of the customary route." What more limited sense can those words
mean than a stop at a place some thirty hours away? It is said that
the clause will allow only reasonable deviations, and this is indeed true,
since such a clause is to be construed in its context. Swift & Co. v.
Furness, etc. (D. C.) 87 Fed. 345. For example, it might not allow
a side voyage to Tampico or Galveston; certainly it would not permit
a call at Rio or Montevideo. But it must mean to give the ship per-
mission to steam by a different route from that she was otherwise
bound to take, besides giving her leave to make ports of call en route;
i. e., "in * * * the customary route." Such permission involves
delay, and was meant to involve delay. There was no nearer port of
lading possible for her than Philadelphia, and the clause was not
limited to ports of discharge. When contained in a bill of lading for
a mixed cargo, it must be read as intended to give the ship some lati-
tude in making up that cargo. It altogether avoids the effect of my
language in the first opinion.

The authorities are in consonance with this result. Thus, in Le
Duc v. Ward, 6 Asp. Mar. L. C. 290, the clause read, "to call at any
ports in any order," and Lord Esher thought that this meant any
ports in the route prescribed. As the voyage was Fiume to Dun-
kirk, and the ship was lost in the Clyde, it was scarcely possible to
excuse her without holding that the clause gave the ship the right to

disregard the whole venture. It is to be noted that the clause did not give her the liberty to call out of the customary route.

The next case was Glynn v. Margetson, [1893] A. C. 351, where the voyage was Malaga to an English port. The bill of lading con-, tained a liberty to call in any order at specified Mediterranean ports, this being printed. It was held that in the case of a voyage from a port like Malaga the general clause did not allow doubling back and fourth in the Mediterranean, but was intended to cover only such ports as were in "a business sense" en route. That clause, too, had no express liberty to call out of the customary route.

In Morrison v. Shaw, [1916] 2 K. B. 783, the bill of lading had two liberties, one in or out of the customary route to pick up cargo in New Zealand, (which Swinfen Eady, L. J., said arguendo gave her the right to stop where she chose for that purpose in New Zealand), the other "to call and stay at any intermediate port" en route to London. The ship, instead of making direct for London, stood in for Havre and was torpedoed. This was held a deviation, though the judges conceded that it was a close case, and depended upon the degree of the departure. There can be little or no doubt that, if the liberty beyond New Zealand had been as broad as that within, the result would have been different. In any event, it rests upon the finding that Havre is not "an intermediate port" between New Zealand and London.

Among American cases, South, etc., Line v. London Stores, 255 Fed. 306, 166 C. C. A. 476 (C. C. A. 5th), is the only one I have found directly in point. There the clause read like that at bar, and the ship was excused on a voyage, Pensacola to Bristol, for a proposed deviation to continental ports of discharge. The libelant seeks to distinguish it on the ground that a custom was proved to call at continental ports, but the court did not mention that as a ground. Had the decision turned upon it, it could only be because it ignored the words "out of the customary route," which it expressly held were lawful. Austrian, etc., Co. v. Calafiore, 194 Fed. 377, 114 C. C. A. 295 (C. C. A. 5th), turned upon an obvious abuse of the liberty.

In The Citta di Messina (D. C.) 169 Fed. 472, the ship delayed at ports of call, a conceded deviation. Hough, J., while noticing that "deviation" is strictly a word used in reference to maritime insurance, excused the ship under a clause when the liberty extended to ports "out of or beyond the route." The case has no direct bearing, but is certainly not at variance with my own conclusions.

In Swift & Co. v. Furness, Withy & Co. (D. C.) 87 Fed. 345, the facts were not unlike Morrison v. Shaw, supra; the clause reading, "to make deviation and to call at intermediate port or ports for any purpose." A deviation to Havre on a voyage, Boston to London, was held to be unnecessary and unreasonable. Perhaps the rule laid down was too strict, since it required the deviation to be necessary, and deviation must be voluntary; but the case is not an authority for the libelant.

The Sidonian (D. C.) 34 Fed. 805, affirmed (C. C. A. 2d) 35 Fed. 534, allowed a call at Palermo on a voyage, Genoa to New York, under a clause which read, "Liberty to call at any port or ports, in any

rotation for any purpose whatever." Palermo being, I should suppose, necessarily out of the customary route as defined by Lord Herschell "in a business sense" (Glynn v. Margetson, supra), this case goes further than the English courts would go, unless the distinction be placed upon the words "for any purpose whatever." However that may be, the case was a weaker one for the ship than that at bar.

It follows, therefore, that the clause excused the deviation to Philadelphia and that the ship's time must run from May 19th and not May 11th. I do not believe that it further extends that time. From the words "in any order" I do not think she got any liberty to retrace her steps, and the voyage, once started, should have been continuous. Nor does her unseaworthiness make any difference; it did not, of course, excuse any delays after May 19th, and she was bound to deliver at Valencia on June 8th. If she failed because unseaworthy, she is liable; but, though unseaworthy, she was entitled to the same time to load as though seaworthy. The libelant was entitled to nothing but carriage by a seaworthy ship leaving on May 19th; that he shall have.

The libelant also argues that the ship is bound by the contract of the Triangle Company: First, because she knew it before breaking ground on the 11th; and, second, because the Triangle Company is estopped to deny itself as the owner "pro hac vice." Neither point is good. The most that The Esrom (C. C. A.) 272 Fed. 266, held was that, when the master weighed anchor, he must be held to have accepted any bills of lading outstanding made in his name, not any contracts of carriage made by the charterer personally. The bill of lading remained the only ship's contract as well after as before it was ratified. The second point I am not sure that I understand. On May 9, 1920, the Triangle Company filed a claim "as agent for the interests" of the Fleet Corporation, and stated that, while it was "in possession" of the Blandon, the corporation was the "true and bona fide owner of said steamship and the carrier of said cargo." That was a complete statement of the facts, and there was no concealment or fraud or anything else thereafter. On what theory the Triangle Company, or its trustee in bankruptcy, may not contest the libel in rem passes my understanding. The stipulation which it gave was not to secure the debts of the Triangle Company, but the lien against the ship. Moreover, nothing happened between May 6th and May 9th which prejudiced the libelant's rights. The general creditors must share in the indemnity, except in so far as the libelant can prove a lien.

It is not necessary now to consider whether the ship could become liable for special damages through notice to the Triangle Company, whose bill of lading the master ratified, if he did not originally authorize it. The only notice was of a contract to deliver the nitrates during May, and the ship rightfully delayed till she could not fulfill that contract. Therefore the commissioner will calculate damages somewhat differently from my first direction. He will ascertain the difference in market value between the nitrates on June 8th and July 5th, and award so much as damages, with interest.