## THE MUSKEGON.

(District Court, S. D. New York. November 5, 1924.)

1. Shipping ⬤≫106—Ship held to have ratified and adopted bills of lading signed by company for which charterer contracted to carry goods.

Ship sailing with cargo, after master filed manifest, without issuing other bills of lading, *held* to have ratified and adopted bills signed by company for which charterers had contracted to transport goods.

2. Shipping ⬤≫131—Ship held liable for duplicate freight charges collected and expenses of watching, storage, etc.

Ship, refusing to deliver cargo to consignees until payment of freight, which had been prepaid to company contracting with charterer for carriage of goods, *held* liable for amounts collected and reasonable expenses of watching, storage, etc.

3. Shipping ⬤≫123—Ship, carrying turpentine on deck, held liable for barrels washed overboard and damaged turpentine.

Ship, carrying turpentine on deck, *held* liable for barrels washed overboard in heavy weather, and for damaged turpentine, where all bills of lading were clean.

4. Evidence ⬤≫407(2)—Shipping ⬤≫106—Bill of lading prima facie evidence of delivery to ship, but may be contradicted or explained.

Bill of lading is prima facie evidence of delivery of goods to ship, but may be contradicted or explained.

**5. Shipping ⊜132(5)—Ship held liable for shortage of steel rails which bill of lading showed were delivered to it.**

Ship *held* liable for shortage of scrap steel rails, which bill of lading and manifest showed were delivered to it, where testimony did not preclude possibility that rails, if not on board at place of destination when consignees were so informed, had been unloaded, and ship did not produce master or any one present during loading or unloading, nor any record contradicting bill.

**6. Shipping ⊜128—Ship held not liable for decay of codfish shipped in summer.**

Ship *held* not liable, under bill of lading, for decay of codfish shipped in summer, in absence of proof of good condition when delivered to it; recital in bill of lading, "In apparent good order and condition," not necessarily meaning that cases contained sound codfish properly cured for sea voyage in summer.

**7. Shipping ⊜131—Ship held not liable to shipper for loss by depreciation of lire on payment of purchase price two years after arrival at Italian port.**

Ship arriving in Italian port on June 18, 1919, and refusing to deliver cargo to consignees named in bills of lading until payment of duplicate freight charges, *held* not liable to shipper for loss by depreciation of lire in June, 1921, when purchase price was paid; such loss being too remote.

**8. Payment ⊜12(5)—Shipper held entitled to recover stated amount of Italian lire for duplicate freight paid at exchange rate existing when decree was entered.**

Shipper obligated in stated amount of Italian lire, payable in Italy, for duplicate freight paid to procure delivery of cargo to consignee named in bill of lading, *held* entitled to recover such amount from ship at rate of exchange existing at time of entry of decree.

**9. Payment ⊜12(5)—Rate of exchange applied in computing freight claims against ship stated.**

Rate of exchange applied in computing freight claims arising from ship's breach of contract by refusal to deliver to consignees until payment of duplicate freight is rate prevailing at time of breach.

Consolidated Libels by the Lucas E. Moore Stave Company and by G. Jaris & Co. and others, against the steamship Muskegon. Decrees for all libelants except the last-named company, and dismissing its claim.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Cletus Keating, of New York City, of counsel), for libelants.

Barry, Wainwright, Thacher & Symmers, of New York City (Earle Farwell and John C. Prizer, both of New York City, of counsel), for claimants.

GODDARD, District Judge. In admiralty. Action in rem against steamship Muskegon. The causes of action alleged in the libels come generally under four heads:

(1) Damages sustained by the libelants by reason of the alleged wrongful failure and refusal of the steamship Muskegon to deliver cargo at Genoa to the consignees in accordance with certain bills of lading until a duplicate freight had been paid under protest. The damages claimed are the amount of the duplicate freight and the expenses the libelants allege they were put to at Genoa by reason of the wrongful refusal of the Muskegon to deliver the cargo as above stated, including, in some instances, losses to the libelants occasioned by delay.

(2) Actual shortages of cargo from the bill of lading quantity.

(3) Damages and loss to the cargo.

(4) Certain miscellaneous damages caused by the failure of the Muskegon to fullfil its contractual obligations.

. Facts.

On April 22, 1919, the Foreign Transport & Mercantile Corporation, as agent for the owners of the Muskegon, chartered her to the Caravel Steamship Lines, Inc., hereinafter referred to as the Caravel Company, for a single voyage from New York to Genoa, Italy, at agreed rate of freight. The charter party contained the following provisions:

"(1) That the said steamship [shall] load a full and complete cargo of lawful merchandise [and] shall therewith proceed as ordered on the signing of the bills of lading to Genoa, Italy, or so near thereto as she may safely get and there * * * deliver the cargo as customary * * * in accordance with the bills of lading."

"(13) The steamer shall be consigned to the charterer's agent at the port of discharge and shall employ their broker to attend the ship's business free of commission."

Thereafter the Caravel Company placed the steamship Muskegon on berth to load cargo. Prior to April 22, 1919, when the charter was signed, an agreement was entered into between the Caravel Company and the Inter-Allied Shipping Company, hereinafter referred to as the Inter-Allied Company, whereby the Caravel Company agreed, if it could charter the steamship Muskegon, to transport on the said Muskegon from New York to Genoa certain merchandise collected by the said Inter-Allied Company, in consideration of said Inter-Allied Company paying said Caravel Company a certain portion of the freight collected on the said merchandise. Some of the cargo covered by the Inter-Al-

lied bills of lading had been collected by the Inter-Allied Company, for intended shipment by another steamer, and the freight collected thereon before this arrangement was made.

The following merchandise, with respect to which Inter-Allied bills of lading were issued, was loaded on the steamship Muskegon:

Allied Machinery Company of America, merchandise described in the libel.

W. P. Marseilles, merchandise described in the libel.

Gaston, Williams & Wigmore, Inc., merchandise described in the libel.

J. Aron & Co., Inc., merchandise described in the libel, with the exception of 73 tons of scrap steel rails, the loading of which on the steamship Muskegon is in dispute.

G. Jaris & Co., merchandise described in the libel.

United Shoe Machinery Corporation, merchandise described in the libel.

Lucas E. Moore Stave Company, merchandise described in the libel.

Worthington Pump & Machinery Corporation, merchandise described in the libel.

Caldwell & Co., Inc., merchandise described in the libel.

Renzo Corinaldi Cohen, merchandise described in the libel.

D. Scrivanich, merchandise described in the libel.

Each of the libelants above named paid the freight to the Inter-Allied Company and received prepaid bills of lading for their cargo, signed by the Inter-Allied Company, requiring the cargo to be delivered to the consignee. The goods were loaded on the Muskegon by the Caravel Company, under the agreement they had with the Inter-Allied Company, whereby they were to receive from the Inter-Allied Company "a certain portion of the freight collected" under the Inter-Allied bills of lading. The remainder of the cargo described in the libels, with the exception of J. Aron & Co.'s 73 tons of scrap rails, which is in dispute, was duly loaded on board the Muskegon and the freight paid to the Caravel Company, who issued its bills of lading for the same. The Muskegon admits the Caravel Company had authority to issue bills of lading.

On May 22, 1919, Captain A. Beckman, master of the Muskegon, filed an official manifest for the steamer for the voyage in question at the New York custom house, and made oath before the deputy collector that all the cargo described above was on board the Muskegon. The Caravel Company paid all the freight due the owners of the Muskegon. Neither the owners of the Muskegon nor the Muskegon had any claim for freight against the cargo. Neither the Foreign Mercantile & Transport Corporation nor the owner of the Muskegon knew of the contract entered into between the Caravel Lines and the Inter-Allied Company. The steamship Muskegon and/or her owner do not claim, and never claimed, any freight against any of the cargo in question here; the Muskegon having been paid its freight before sailing from New York. On May 24, 1919, the steamship Muskegon sailed for Genoa, Italy, where in due course she arrived.

The only bills of lading ever issued were those issued by the Caravel Company, Nos. 1 to 21, and by the Inter-Allied Company, Nos. 1 to 208. The steamer's agents at Genoa were Messrs. Wax & Vitale, who were appointed in pursuance of clause 13 of the charter party. When the steamship Muskegon arrived in Genoa, instead of delivering the cargo to the consignees, as required by the bills of lading, delivery was made to Messrs. Wax & Vitale, who were also the agents of the charterers. Wax & Vitale, the steamer's and charterer's agents at Genoa, acting under instructions of the Caravel Company, with the concurrence of the steamer, refused to permit the consignee to receive any of their cargo covered by the bills of lading on the Inter-Allied Company until a duplicate freight had been paid. In order to obtain delivery of the cargo, freight was therefor paid under protest to Messrs. Wax & Vitale by the consignees or their agents. The action of the Caravel Company in instructing Wax & Vitale to make the libelants pay a duplicate freight was not because freight had not been paid to the steamer—that freight having been prepaid at New York—but because of the fact that the Inter-Allied Company had failed to pay to the Caravel Company the agreed portion of the freight which the Inter-Allied Company had collected at New York from the shippers. It is for the failure and refusal of the steamship Muskegon to deliver the cargo in accordance with the bills of lading to the named consignees that the libelants bring suit.

[1] The charter party stipulated that the captain should sign bills of lading or master's receipts as and when presented without prejudice or reference to the charter party. The evidence that the Inter-Allied Company originally had authority to bind the ship is not convincing; so the vital question is: Was there an adoption and ratification of the In-

ter-Allied bills of lading by sailing with cargo on board and without issuing other bills of lading?

Many of the bills of lading were issued by the Caravel Company before it had chartered the Muskegon. The president of the Foreign Transport & Mercantile Company, representing the owner of the Muskegon, testified:

"Q. Do you deny that the Muskegon carried forward the cargo covered by the Caravel Steamship Lines under these bills of lading? A. No, indeed.

"Q. You admit that they did? A. Yes.

"Q. What bills of lading did they carry the other cargo forward under? A. I heard afterwards that it was the Inter-Allied bills of lading. * * *

"Q. You are satisfied that the cargo was carried forward under those Inter-Allied bills of lading? A. I have no doubt about it in the world."

This, of course, cannot be accepted as a declaration of the law, but it is some indication of the understanding and intention.

When the Muskegon sailed away with the cargo, after her master had filed her manifest with the custom house officials, and without issuing other bills of lading, then there was an adoption and ratification by the ship of the bills of lading signed by the Inter-Allied Company. This, I believe, was not only the legal effect of her acts, but also that it was the master's intention to adopt the bills of lading which had been issued by the Inter-Allied Company as the contracts under which the cargo was carried; not a thing was done to indicate any other intention, and he had reason to believe that the shippers had delivered their goods to the ship and had accepted bills of lading, and relied upon their being valid. The ship's starting on the voyage to Genóa under these conditions had some legal effect, and that was the adoption of the Inter-Allied bills of lading by the ship.

In The Esrom, 272 F. 266, at page 271, Judge Manton, speaking for the Circuit Court of Appeals for the Second Circuit, said:

"The obligations which are created one to the other, then, are that the ship is bound not to injure the merchandise by improper stowage or rough handling, and, if she does, then there will be a liability in rem, even before the voyage is begun. If the voyage is begun, the vessel must carry the goods to destination on the terms agreed by the shipper with the charterer; for when the vessel starts upon the voyage, by implication, there is a ratification and adoption by the ship of the charterer's contract with the shipper. Then the shipper is deprived of an opportunity to retake his goods, and the goods are in the sole possession and control of the ship. So, too, the ship is then bound by the charterer's bill of lading, under which the freight is prepaid, and cannot collect further freight at destination. The Ada (D. C.) 233 F. 325. Before sailing, the vessel owner is protected by his opportunity to refuse to carry the goods on the terms agreed by the charterer before the voyage is commenced."

In The Ada (D. C.) 233 F. 325, at page 327, Judge Rose states:

"The libelant cites many authorities for the contention that a charterer in possession of the vessel may bind it to the cargo received on board. I do not think it necessary in this case to go into any discussion of such questions. Before the ship sailed it knew that the libelant had never promised to pay more than $1,264.59, and that it was not willing to pay more. It is true that it did not demand that its goods be returned to it, but it reiterated its refusal to pay a higher price. Under such circumstances the ship, if it was not willing to carry the cargo at the only rate to which libelant ever agreed, should have discharged it. There is nothing in the agreed statement of facts to show that such discharge would be impracticable. The ship could not make a contract with libelant to which libelant had never consented. It follows that the libelant may have a decree for the amount claimed."

In The G. A. Tomlinson (D. C.) 293 F. 51, Judge Hazel, in his opinion on page 52, states:

"The fact that the bills of lading were issued by the charterer, instead of by the steamship, does not, in my opinion, relieve the personified ship from liability for failure to make right delivery of the cargo. Her master, at Duluth, accepted the cargo over the rail of the ship, and it is not of material importance per se that he personally was unaware of the unloading conditions. It may safely be held as a matter of law that he is presumed to have known that the charterer in due course, as agent for the ship, would issue bills of lading for shipments of grain, which after it was taken aboard became subject to maritime liens. The Poznan (D. C.) 276 F. 418; The Blandon (D. C.) 287 F. 722."

The court then cites that part of Judge Manton's opinion in The Esrom wherein Judge Manton laid down the principle that,

when the vessel starts upon the voyage, it adopts and ratifies the bill of lading issued by an unauthorized person. See, also, The Blandon (D. C.) 287 F. 722; The Poznan (D. C.) 276 F. 418; The Sprott, 70 F. 327.

[2] The facts in the present case are not the same as those in Maella Atkieselskabet Bruusgaard v. Standard Oil Co. of New Jersey (C. C. A.) 283 F. 106. There, the freight due the ship not having been paid, the master notified the shippers that the bill of lading issued was without authority, and it refused to adopt the bill of lading which was unauthorized, and refused to sail with the cargo until the matter was adjusted.

The ship's liability having been determined, and it being admitted that duplicate freight was collected as follows:

| | |
|---|---|
| J. Aron & Co., Inc. | $ 4,103.69 |
| International General Electric Company | 33,037.28 |
| Gaston, Williams & Wigmore, Inc. | 27,483.99 |
| G. Jaris & Co. | 5,970.00 |
| United Shoe Machinery Corporation | 5,624.48 |
| Lucas E. Moore Stave Company | 2,320.75 |
| Worthington Pump & Machinery Corporation | 1,428.64 |
| Caldwell & Co., Inc. | 1,141.12 |
| Selson Engineering Company of New York, Inc. | 969.89 |
| Renzo Corinaldi Cohen | 643.24 |
| D. Scrivenich | 291.26 |
| W. P. Marseilles | 60.29 |
| Allied Machinery Company of America | 2,620.76 |

—therefore these respective amounts should be returned to them, and the various libelants are entitled to the expenses which they were reasonably put to for watching, storage, etc., by reason of the failure of the Muskegon to make delivery as called for under the bills of lading.

Claim of Lucas E. Moore Stave Company for shortage: The libel of Lucas E. Moore Stave Company alleges that 66,307 staves were shipped on board the Muskegon, and it is admitted that this merchandise was loaded on the Muskegon. At Genoa, there was an actual shortage of 1,370 staves. No defense is pleaded or proved which would excuse the carrier.

Claim of United Shoe Machinery Corporation for shortage of one case of wire and two cases of nails: The proof of this loss is uncontradicted.

Claim of J. Aron & Co., Inc., for shortage of 19 bags of cocoa: It is admitted that 1,298 bags of cocoa were shipped, and the uncontradicted testimony is that less than that amount of bags were delivered; therefore there is a shortage, which should be made good.

[3] Claim of J. Aron & Co., Inc., for shortage and damage to turpentine: The shipment consisted of 617 barrels, 310 of which were covered by Inter-Allied bills of lading, 307 by Caravel bills of lading. On discharge there was an actual shortage altogether of 5 barrels and their contents. Twelve barrels were delivered absolutely empty, and the remaining barrels were leaking so badly that, after they were put into lighters furnished by the steamship Muskegon, enough turpentine in a damaged condition was collected to fill 75 barrels. The consignment consisted of 100 tons. Of this 100 tons, 70 tons were delivered, 58 in good condition and 12 in damaged condition. The turpentine, or at least a large portion of it, was carried on the deck of the Muskegon. Neither the Caravel bills of lading for 307 barrels of turpentine, nor the Inter-Allied bills of lading for 310 barrels of turpentine, gave the steamship the right to carry the turpentine on deck. The bills of lading were all clean.

Mr. Justice McReynolds, in the opinion in the case of The St. Johns, N. F., 44 S. Ct. 30, 263 U. S. 119, 68 L. Ed. 201, affirming 280 F. 553 (C. C. A. 2d Circuit) said:

"By stowing the goods on deck the vessel broke her contract, exposed them to greater risk than had been agreed, and thereby directly caused the loss. She accordingly became liable as for a deviation, cannot escape by reason of the relieving clauses inserted in the bill of lading for her benefit, and must account for the value at destination."

So the Muskegon is liable for the 5 barrels which the testimony indicates was washed overboard in the heavy weather encountered by her, and also for the damaged turpentine, for they were clean bills of lading.

[4,5] Claim of J. Aron & Co., Inc., for shortage of 73 tons of scrap steel rails: The bill of lading was issued April 30, 1919, eight days after agreement between the Inter-Allied Shipping Company and the Caravel Steamship Company had been entered into, and is prima facie evidence of their delivery. The master of the Muskegon filed at the custom house in New York an official sworn manifest, which included these steel rails, describing them, not as the 73 tons "steel scrap rails," as mentioned in the bill of lading, but listed them as 284,840 pounds of "old steel rails," which is a greater weight than 73 tons, which tends to confirm the prima facie case made out by the libelant.

A bill of lading, as a receipt, may be contradicted or explained. The Isla de Panay (C. C. A.) 292 F. 723. But an examination

of all the testimony and the exhibits shows a lack of convincing proof sufficient to overcome the case made out by libelant. The Muskegon arrived in Genoa on June 18, 1919, and her cargo was all discharged by June 26th, but it was not until July 12th, after the ship's agents had twice refused to deliver the rails unless the freight was paid, and when finally the consignees consented to do so, that the consignees were told that the rails were not on board; and it must be admitted that the testimony that the rails were not on board at Genoa is not particularly strong, and does not preclude the possibility that the rails may have been taken off, as the Muskegon unloaded her cargo upon three wharves in Genoa, and a part being discharged into lighters. The ship has not produced the master, the mate, nor any one who was present during the loading, nor the stevedores who discharged her cargo, nor any record which contradicts the bill of lading.

[6] Claim of G. Jaris for damage to codfish: It is admitted that it was carried on the Muskegon. While the bill of lading recited, "In apparent good order and condition," that does not necessarily mean that the cases contained sound codfish properly cured for a sea voyage in the summer. At the end of the voyage, on which there were no unusual delays, the fish was found to be decayed. In the absence of all proof that the fish was in good condition when delivered to the Muskegon, I believe that the decay was due to its poor condition when shipped. The bill of lading contained the following clause: " * * * That the carrier shall not be liable for losses or damage occasioned by * * * heating, frost, decay, putrefaction, rust, sweat, change of character, of any of the goods, whether shipped with or without disclosure of their nature or any loss or damage arising from the nature of the goods, * * * and that the carrier shall not be concluded as to the correctness of statements herein of quality, quantity, gauge, contents, weight, and value."

In The Isla de Panay, supra, Judge Rogers, speaking for the Circuit Court of Appeals, Second Circuit, stated:

"The general rule is that, where a loss arises from an excepted peril, the ship is prima facie excused, and can only be held liable upon affirmative proof that some negligence on the ship's part was the efficient cause of the loss."

See, also, The Konigin Luise (D. C.) 173 F. 811; The Koranna (D. C.) 214 F. 172; E. Tolibia & Co., Inc., v. S. S. Orion (C. C. A.) 290 F. 379.

[7] Claim of Selson Engineering Company of New York, Inc., for damage caused by depreciation of the lire: The Muskegon arrived in Genoa on June 18, 1919; the loss by depreciation of the lire is based upon the payment of the purchase price in June, 1921. The Muskegon cannot be held accountable for such loss. It is too remote.

[8] Claim of D. Scrivanich for duplicate freight paid: This is an obligation of the libelant for 2,338.80 lire to be paid in Italy; so that he is entitled to recover that amount of lire at the rate of exchange existing at the time of the entry of the decree herein.

[9] The rate of exchange to be applied in computing the freight claims which are allowed is the rate prevailing at the time of the breach of the contract. Guiness v. Miller (D. C.) 291 F. 769, affirmed 299 F. 538, C. C. A. 2d Circuit, April 14, 1924. In this case our Circuit Court of Appeals said:

"The rate of exchange on the date of the injury or breach of contract is the measure for transferring the indebtedness into the United States currency. * * * We regard this rule as applicable, whether the action be in contract or in tort. Primarily the plaintiff is entitled to recover a sum expressed in foreign money. In theory, he is to be made whole for the injury suffered at the time. The judgment which grants him the relief should express in our currency the rate of exchange prevailing at the date of the breach of the contract or at the date of the commission of the tort."

See, also, Birge-Forbes Co. v. Haye (C. C. A. 5th Circuit) 248 F. 636, 160 C. C. A. 536, affirmed 251 U. S. 317, 40 S. Ct. 160, 64 L. Ed. 286.

The stipulated rate of exchange at the time of the breach of the contracts was 8.03 lire.

Accordingly, decrees may be entered for duplicate freight payments in favor of the following libelants for the respective amounts:

| | |
|---|---|
| J. Aron & Co., Inc. | $ 4,103.69 |
| International General Electric Company | 33,037.28 |
| Gaston, Williams & Wigmore, Inc. | 27,483.99 |
| G. Jaris & Co. | 5,970.00 |
| United Shoe Machinery Corporation | 5,624.48 |
| Lucas E. Moore Stave Company | 2,320.75 |
| Worthington Pump & Machinery Corporation | 1,428.64 |
| Caldwell & Co., Inc. | 1,141.12 |
| Selson Engineering Company of New York, Inc. | 969.89 |
| Renzo Corinaldi Cohen | 643.24 |
| W. P. Marseilles | 60.29 |
| Allied Machinery Company of America | 2,620.76 |

—and in favor of the libelant D. Scrivanich for 2,338.80 lire, at the rate of exchange existing at the time of the entry of the decree herein; awarding the various libelants, in accordance with the above, the expenses they were reasonably put to for watching, storage, etc., by reason of the failure of the Muskegon to deliver the cargo as required by the bills of lading, with reference to a commissioner to ascertain the amounts thereof; and

Awarding the libelant J. Aron & Co., Inc., the value of cocoa short-delivered and the loss and damage to 617 barrels of turpentine short-delivered and damaged, and the value of 73 tons of steel rails short-delivered, with reference to a commissioner to ascertain the amounts thereof; and

Awarding the libelant United Shoe Machinery Corporation the damages caused by the shortage of one case of wire and two cases of nails short-delivered by the steamship Muskegon, with reference to a commissioner to ascertain the amount thereof; and

Awarding the libelant Lucas E. Moore Stave Company its damages caused by shortage of 1,370 staves short-delivered by the steamship Muskegon, with reference to a commissioner to ascertain the amount thereof; and

Awarding the respective libelants interest on all sums due, with the costs in their suits; and

Dismissing the claim of G. Jaris & Co. for damage to codfish.