723 F.2d 1096
 1984 A.M.C. 609
 CAVCAR COMPANY, an Iranian Corporation
v.
M/V SUZDAL, her engines, boilers, tackle, etc., In Rem and
Black Sea Shipping Company, a foreign corporation,
In Personam.
MARINE TRANSPORT SERVICE, INC., a New York Corporation and
First Pennsylvania Bank, Plaintiff and Counter-Respondent,
v.
CAVCAR COMPANY and Sherkate Sahami Khass Auto Pars, both
foreign corporations, Defendants & Counter-Claimants,
v.
Thomas J. HOLT; Holt Hauling & Warehousing Systems, Inc.;
B.H. Sobelman & Co., Inc.; Waterside Ocean Navigation,
Inc.; Gloucester Shipping Corp. of Monrovia; Holt Marine
Terminals, Inc.; Holt Motor Express, Inc.; World Wide
Marine Trading Corporation; T & L Leasing, Inc.; and
Camden Refrigerating & Terminal, Inc., Additional Counter-Respondents,
v.
MTS AGENCIES, INC., and Anthony Castelbuono, Individually
and as a Former Partner in the firm of Austrian, Lance &
Stewart and Irving B. Stewart, as Partner in the firm of
Austrian, Lance & Stewart and David S. Brown, as Partner in
the firm of Austrian, Lance & Stewart and Patton R.
Corrigan, as Partner in the firm of Austrian, Lance &
Stewart and Mark J. Kronman, as Partner in the firm of
Austrian, Lance & Stewart and Julius J. Rosen, as Partner in
the firm of Austrian, Lance & Stewart, Third Party
Counterclaim Defendants.
SHERKATE SAHAMI KHASS AUTO PARS, an Iranian Corporation,
Plaintiff-Appellant,
v.
M/V FINN-AMER, her engines, boilers, tackle, etc., In Rem
and Amer Sea O/Y a foreign corporation, In
Personam, Defendants-Appellees.
 No. 83-5105.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 26, 1983.
Decided Dec. 19, 1983.
 
 1
 Henry C. Lucas, III, Douglas H. Riblet (argued), Rawle & Henderson, Philadelphia, Pa., Donald V. Feeley, Rudd, McDonough & Feeley, Westmont, N.J., for plaintiff-appellant.
 
 
 2
 Patrick V. Martin (argued), Douglas R. Burnett, Law Offices of Martin B. Mulroy, Newark, N.J., for defendants-appellees.
 
 
 3
 Before ALDISERT and BECKER, Circuit Judges, and POLLAK, District Judge.*
 
 OPINION OF THE COURT
 
 4
 LOUIS H. POLLAK, District Judge.
 
 
 5
 This appeal raises the question whether a vessel may be liable in rem for breach of the contract of carriage by the operator of the vessel when the vessel's owner is not liable in personam for the breach. The district court held that there can be no in rem liability in such circumstances. For the reasons stated below, we reverse.
 
 I.
 
 6
 This case has a long and complex factual and procedural history which must be reviewed, at least in summary form, in order to understand the legal issues presented on appeal. In 1975, appellant, Sherkate Sahami Khass Auto Pars ("Auto Pars") ordered 200 Ford Bronco trucks from Ford Export Corporation. This purchase was financed by two letters of credit issued by Iranian banks. At the port of Philadelphia, forty-nine of these vehicles were loaded on the M/V FINN AMER ("Finn Amer"), the appellee.
 
 
 7
 The Finn Amer is registered in Finland and is owned by Amer Sea O/Y ("Amer Sea") a Finnish company. When this controversy arose, the Finn Amer was time-chartered to Gloucester Shipping Corporation which is not a party to these proceedings. Although the master of the Finn Amer was employed by Amer Sea, the vessel was operated by Marine Transport Services (MTS), a New Jersey corporation. The district court found that "MTS provided the operational infrastructure, arranged the stevedoring, solicited cargo, processed all documents and established an agency network in overseas points with respect to the Finn-Amer. It did not charter that vessel." App. 347a.
 
 
 8
 When the forty-nine Broncos were loaded on the vessel, MTS issued a negotiable bill of lading. The bill of lading specified Bandar Shahpour, a port of Iran, as the destination. It listed as consignee "Order of: Bank of Teheran Takhte Djamshid Branch, Teheran, Iran" and as "notify party" the appellant, Auto Pars. Amer Sea was not a party to the bill of lading and the master of the Finn Amer never saw the bill of lading.
 
 
 9
 The Finn Amer arrived at Bandar Shahpour on January 23, 1976. Auto Pars was notified of the vessel's arrival and was requested by MTS to "preclear" the Broncos. Preclearance is a procedure by which the customs duty on the cargo is paid in advance of discharge and the consignee takes direct delivery from the side of the vessel. The district court found that there was no legal requirement of preclearance and that consignees generally resisted the preclearance system.[1]
 
 
 10
 The Finn Amer was granted berth on February 19, 1976. It discharged all of its cargo other than the forty-nine Broncos. The Broncos were the only cargo which was not precleared. While the vessel was at Bandar Shahpour no bill of lading was presented for these vehicles. In fact, the original bill of lading remains at the Bank of Teheran, Takhte Djamshid Branch.
 
 
 11
 On February 23, without giving notice to Auto Pars, MTS ordered the Finn Amer to depart from Bandar Shahpour with the Broncos. It did so and returned the vehicles to Philadelphia as directed by MTS. The Broncos were impounded and eventually sold by United States Customs.
 
 
 12
 This suit is one of two which arose from the shipping of the forty-nine Broncos. In 1976, MTS filed suit in the federal district court in New Jersey against Auto Pars to recover for losses sustained due to MTS' inability to deliver the vehicles. Auto Pars counterclaimed against MTS for failure to deliver the cargo. That action was later consolidated with the action presently before us--a suit for damages for nondelivery of the Broncos which was filed in 1977 by Auto Pars against the Finn Amer and Amer Sea.[2] After a bench trial, the district court filed detailed findings of fact and conclusions of law. The court determined that MTS was a "carrier" under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. Secs. 1300-15 and was liable to Auto Pars for failure to deliver the cargo. In addition, the court held that Auto Pars was not liable to MTS for any costs related to the return of the vehicles to Philadelphia. Moreover, the court found that neither Amer Sea nor the Finn Amer were parties to the bill of lading and the master of the ship had taken all relevant actions solely under the direction of MTS. The court concluded that Amer Sea, the owner of the Finn Amer, was not liable for the nondelivery of the cargo and that Auto Pars had failed to establish any basis for the imposition of in rem liability.
 
 
 13
 Auto Pars has appealed the district court's decision solely with respect to the finding on in rem liability. It does not dispute the lower court's finding that Amer Sea is not personally liable for the nondelivery. The primary issue before us is whether in rem liability exists when the charterer or operator of the vessel has breached the contract of carriage but the shipowner is not personally liable for the breach.[3]
 
 II.
 
 14
 In arguing to the district court that the Finn Amer was liable in rem, Auto Pars relied on the Supreme Court's venerable decision in The Barnstable, 181 U.S. 464, 21 S.Ct. 684, 45 L.Ed. 954 (1901). In that case the libeled vessel was the British steamship Barnstable which had collided off Cape Cod with the schooner Fortuna--"a collision resulting from the negligence of the officers and crew, who are appointed and paid by the charterers." 181 U.S. at 466, 21 S.Ct. at 685. The question before the Court was whether, under the terms of the charter party governing the negligently operated Barnstable, ultimate liability lay with the charterers or the owners. En route to resolving this issue, Justice Brown, speaking for a unanimous Court, observed that, "[w]hatever may be the English rule with respect to the liability of a vessel for damages occasioned by the neglect of the charterer, as to which there appears to be some doubt ... the law in this country is entirely well-settled that the ship itself is to be treated in some sense as a principal, and as personally liable for the negligence of anyone who is lawfully in possession of her, whether as owner or charterer." 181 U.S. at 467, 21 S.Ct. at 685.
 
 
 15
 Not surprisingly, the district court in the instant case concluded that The Barnstable was of little avail to Auto Pars since Auto Pars' "claim sounded in contract and not negligence ... The Barnstable did not, even remotely, support imposition of liability under the facts of this case." App. 405a.
 
 
 16
 Auto Pars may not be able to derive any comfort from the Court's decision in The Barnstable, or from what the Court held or said in Reed v. The Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1960), an in rem proceeding of more recent vintage. Neither of those suits involved the type of claim presented here--an action by a shipper of goods against a vessel in rem for breach of the contract of carriage. On the other hand, nothing in those Supreme Court holdings or opinions forecloses the transposition of that in rem analysis to a situation involving a breach of the contract of carriage.
 
 
 17
 Within the Second Circuit, at both the trial and appellate levels, there has developed over the past six decades a corpus of authority which strongly supports the imposition on the Finn Amer of in rem liability for failure to fulfill the various obligations contained in the bill of lading. The first of these cases was The Esrom, 272 F. 266, 267 (2d Cir.1921), in which a divided panel of the Court of Appeals--each of whose members filed an opinion--found that the vessel was not liable in rem for damage to a shipment of prunes. The damage to the prunes had resulted from delay in the vessel's departure from New York but the delay was held to impose no liability on the vessel since the charter bound the vessel not to sail until full and the master had no knowledge of the perishable nature of the goods. Although Judge Manton, writing the principal opinion, found no liability in rem under those facts, he observed that as a general proposition "[t]he ship may be held liable in rem for damages to the cargo even though no bill of lading or contract of affreightment was signed by the master." 272 F. at 269. This was so because "[i]f the voyage is begun, the vessel must carry the goods to the destination on the terms agreed by the shipper with the charterer; for when the vessel starts upon the voyage, by implication, there is a ratification and adoption by the ship of the charterer's contract with shipper." 272 F. at 271.[4]
 
 
 18
 In 1921, Judge Learned Hand, then a District Judge, considered a claim which was in important respects closely analogous to the present action. The Poznan, 276 F. 418 (S.D.N.Y.). That suit involved claims by numerous shippers against the ship in rem and the shipowner and charterer in personam for failure to deliver their goods in Havana, the ship having returned to New York with its cargo after waiting for a berth in Havana for almost two months. The ship was held liable in rem although the master had signed only a few of the bills of lading in question. The charter party did not provide for the master to sign the bills of lading but instead contemplated that all of them would be in the charterer's name. Thus, the shipowner was not a party to the contract of carriage. Judge Hand nonetheless held that "[b]eing once laden she was bound for right delivery though the charterers sign.... Indeed, the cargo would have a 'privilege' against the ship for right delivery even without any bill of lading." 276 F. at 432. Liability in rem was thus found notwithstanding that the shipowner was not liable in personam for breach of contract.[5]
 
 
 19
 Soon thereafter, Judge Hand considered a similar in rem claim arising from a ship's deviation from the course established by the bill of lading and again found liability in rem although the shipowner had no personal liability under the bill of lading. The Blandon, 287 F. 722 (S.D.N.Y.1922). The charterer had signed the bill of lading and the master had not, but the court found "that the master must be held to ratify all bills of lading once he set sail." 287 F. at 723. Judge Hand noted that this case could be distinguished from The Esrom because the charter in The Esrom was a voyage charter which would state a destination and, thus, could be viewed as directly establishing the ship's duty. "But this is not possible in a time charter, where the destination is not described." 287 F. at 723. However, he declined to relieve the vessel of liability on such a basis. "Whatever, therefore, may be the rule before the ship breaks ground, it seems to me clear that thereafter the bill of lading, though signed by the charterer only, is the measure of the ship's duty and the cargo's 'privilege.' " 287 F. at 724.
 
 
 20
 Judge Manton's Esrom analysis was also followed by Judge Hazel in The G.A. Tomlinson, 293 F. 51 (W.D.N.Y.1923), in which the vessel was held liable in rem for misdelivery of cargo when the grain was off-loaded at a grain elevator other than that specified in the bill of lading: "The fact that the bills of lading were issued by the charterer, instead of by the steamship, does not, in my opinion, relieve the personified ship from liability for failure to make right delivery of the cargo.... It makes no difference that the master did not sign or issue the bills of lading, for on the Great Lakes they are customarily signed by vessel agencies only, and, being laden, she was required to make right delivery, though bills of lading were signed by the charterer." 293 F. at 52.[6]
 
 
 21
 Canvassing the same issues forty years later in United Nations Children's Fund v. S/S Nordstern, 251 F.Supp. 833 (S.D.N.Y.1965), Judge Levet concluded that the edifice Judge Hand and his district court colleagues had reared upon The Esrom was secure. In Nordstern, the shipper proceeded against the shipowner and time charterer in personam for damages stemming from the vessel's deviation and resulting failure to deliver at the designated port. The vessel was held liable in rem despite the fact that, as in the present action, the master had not signed the bill of lading and the charterer was solely responsible for the decision to bypass the designated port. Judge Levet reviewed the cases discussed above and found that "in this court's opinion, those decisions make good sense. Once the voyage has begun, the goods are beyond the shipper's control. It seems eminently reasonable to hold that the ship has a duty to deliver them to the destination provided in the bill of lading being carried by the ship.... Indeed, the maritime lien and the proceeding against the ship itself do seem 'the best and surest pledge for the compensation and indemnity to the injured party.' " 251 F.Supp. at 837-38.[7]
 
 
 22
 In 1972, the Court of Appeals for the Second Circuit gave its full imprimatur to the ratification principle. Demsey & Associates, Inc. v. S.S. Sea Star, 461 F.2d 1009 (1972).[8] Judge Medina, speaking for the court, found that "[a]lthough the Master did not sign the bills of lading, the sailing of the Sea Star with the coils aboard constituted a ratification of the bills of lading. The Muskegon, 10 F.2d 817 (S.D.N.Y.1924); United Nations Children's Fund v. S/S Nordstern, 251 F.Supp. 833 (S.D.N.Y.1965)." 461 F.2d at 1015. Thus, the ship was held liable despite the absence of in personam liability of the shipowner.
 
 
 23
 The consistent trial and appellate court holdings in the Second Circuit that in rem liability is justified for breaches of the contract of carriage, whether these breaches take the form of misdelivery, nondelivery, or damage to cargo,[9] find impressive support in the authoritative treatise by Professor Charles L. Black, Jr. and the late Professor Grant Gilmore. The treatise cites with approval the district court opinion affirmed in part in Demsey, noting that the shipowner "cannot prevent, of course, the arising of the usual liens against his vessel, where these accrue because of cargo damage or nondelivery, even when he cannot be held personally liable." G. Gilmore & C. Black, Jr., The Law of Admiralty Sec. 4-17 (2d ed. 1975).[10] The treatise also points out that such a result is proper as a matter of public policy in that it provides security to those who suffer a wrong through the instrumentality of the ship by creating limited shipowner liability for the actions of third parties to whom they have entrusted control. Id. at Sec. 9-18a.[11]
 
 
 24
 We find the foregoing analysis doctrinally persuasive and dispositive of the present appeal. Although the master of the Finn Amer did not sign the bill of lading for the forty-nine Broncos, the departure of the ship from Philadelphia with the cargo on board effected an implied ratification of the bill of lading, binding the ship to the obligations therein, including the duty to deliver the goods at the designated port.[12] Therefore, the vessel is liable in rem even though Amer Sea is not personally liable in contract for the breach. Our decision does not address the Finn Amer's possible right to indemnification from the party primarily responsible for the injury.[13] See e.g., Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 428, 79 S.Ct. 445, 448, 3 L.Ed.2d 413 (1959); British West Indies Produce, Inc. v. S/S Atlantic Clipper, 353 F.Supp. 548, 555 (S.D.N.Y.1973).
 
 
 25
 Accordingly, the judgment below will be reversed and the case remanded for proceedings consistent with this opinion.[14]
 
 
 
 *
 Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The district court noted that the reason for this reluctance to preclear cargo was the fact that it was difficult to obtain repayment of the duty from the Iranian authorities once the duty had been paid. In addition, if the cargo was not precleared, the recipient of the cargo could keep it in the customs warehouse for up to four months before being required to provide its own storage facilities
 
 
 [2]
 These actions were also consolidated with suits stemming from a shipment of seventy-nine Mack Trucks to Iran by MTS on another vessel, M/V SUZDAL. Marine Transport Services, Inc. v. Cavcar Co., No. 76-0683; Cavcar Company v. M/V SUZDAL, No. 77-0274
 
 
 [3]
 The secondary issues are insubstantial:
 Appellee Finn Amer contends that Auto Pars is not entitled to present to this court its claim that the Finn Amer was liable in rem because the question was not properly presented to the district court. The contention is without merit. The district court's conclusion of law number 55 expressly recites: "Defendants have failed to establish any basis for the imposition of in rem liability upon the vessels Suzdal and Finn-Amer." Having been considered and determined below, the question is ripe for review here.
 Appellee also contends that, because the Bank of Teheran is the named consignee on the bill of lading, Auto Pars is not "the real party in interest" within the meaning of Federal Rule of Civil Procedure 17(a). We disagree. Auto Pars, having ordered and undertaken to import the trucks covered by the bill of lading, was the "notify party" on the bill of lading, reflecting its beneficial interest in the trucks. That beneficial interest was recognized by the district court in its findings of fact and conclusions of law. App. 363a, 367a, and 371a. Assuming arguendo that the Bank of Teheran, as named consignee, might have had sufficient interest to sue had it elected to do so, there is no ground for concluding that Auto Pars could not sue, the Bank of Teheran not having done so. Cf. The Thames, 81 U.S. (14 Wall.) 98, 108, 20 L.Ed. 804 (1871).
 See also note 14 infra.
 
 
 [4]
 Judge Hough, while "substantially agreeing" with Judge Manton, concluded that whereas the ship could be held liable for "proper stowage, seamanlike management, and right delivery," 272 F. at 273, in the absence of a contract binding the shipowners to the bill of lading, only the charterer could be liable for delay in sailing. Judge Ward, dissenting, found that whether or not the master of the vessel had signed the bill of lading was irrelevant. He would have held the ship liable in rem because "[h]aving accepted a shipment of prunes, she was bound to sail within a reasonable time for prunes." 272 F. at 275
 
 
 [5]
 Judge Hand did find the owner liable in personam for directing the ship's tortious return from Havana to New York; but the ship's in rem liability for breach of the contract of carriage was independent of the shipowner's tort liability
 
 
 [6]
 Judge Goddard, of the Southern District of New York, addressed the same issue in 1924 in the case of The Muskegon, 10 F.2d 817. In that case, the libel was brought in rem for failure of delivery and refusal by the vessel to deliver the cargo in accordance with the bills of lading. After discussing the prior cases within the Second Circuit, Judge Goddard found on the facts before him an adoption and ratification of the bills of lading upon sailing since "not a thing was done to indicate any other intention." 10 F.2d at 820
 
 
 [7]
 Judge Levet found in rem liability particularly reasonable in light of the master's awareness that under the bill of lading he was to proceed to Karachi, the designated port. Similarly, in the present case the district court found that "[t]he master of the Finn-Amer believed that all of his cargo would be discharged in Bandar Shahpour." App. 366a
 
 
 [8]
 Forty-six years earlier in The Capitaine Faure, 10 F.2d 950, 967 (1926), the Second Circuit had specifically reserved the question whether the ship's breaking ground resulted in an implied ratification of the charterer's bill of lading, noting that the statements to that effect in The Esrom were only dicta
 
 
 [9]
 See British West Indies Produce, Inc. v. S/S Atlantic Clipper, 353 F.Supp. 548 (S.D.N.Y.1973) (Weinfeld, J.) (vessel liable in rem for damage to cargo of yams, ginger, and pumpkins caused by time charterer's decision to discharge the cargo onto a pier in cold weather upon arrival at the designated destination)
 
 
 [10]
 As additional support for this conclusion, the treatise refers to the language of the Carriage of Goods by Sea Act, 46 U.S.C. Sec. 1303. This portion of the statute, establishing the grounds for holding a carrier liable, describes the "responsibilities and liabilities of the carrier and ship" (emphasis supplied). Subsection 8 specifically declares null and void a contractual provision "relieving the carrier or the ship from liability." (emphasis supplied)
 
 
 [11]
 The Gilmore and Black treatise also advances the view that "the rule of The Barnstable might well be expanded to one of unlimited (i.e., in personam ) liability for the third party's torts and breaches, subject to the shipowner's right to recover indemnification from the party subjectively at fault." G. Gilmore & C. Black Jr., The Law of Admiralty Sec. 9-18a at 621 (2d ed. 1975) (emphasis supplied). Whether such a breach should give rise to in personam shipowner liability is an issue not posed by the present appeal
 
 
 [12]
 The district court found that MTS was not a "charterer" of the Finn Amer although it was the "operator" of the vessel and responsible for the direction and management of the vessel with respect to the pickup and delivery of cargo. It therefore found MTS liable as a "carrier" under the Carriage of Goods by Sea Act. Although the cases in the Second Circuit all involved breaches of the contract of carriage by charterers, we do not believe that MTS' status as "operator" rather than "charterer" involves a distinction of any consequence: The liability-producing activities of MTS stem from functions equivalent to those of the charterers in the Second Circuit cases. Although MTS was not a direct party to the time charter, it was a beneficiary of that agreement and the functional equivalent of the charterer for the purposes of the issues before this court
 
 
 [13]
 The district court's conclusion of law number 34 found that "MTS agreed to indemnify the owner against all consequences arising out of the master's compliance with the charterer's orders." In addition, conclusion of law number 36 states "Amer Sea is entitled to enforcement of the indemnification clause." App. 373a
 
 
 [14]
 The appellee's "statement of the case" on appeal asserts that the question of in rem jurisdiction of the district court was "rendered moot" by that court's resolution of the question of in rem liability. This suggests some question as to the existence of in rem jurisdiction in the district court. This jurisdictional issue was not raised as an issue in this appeal. A likely explanation is that the question of personal jurisdiction seems not to have been raised in the district court by timely motion or responsive pleading and hence, pursuant to Rule 12(h) of the Federal Rules of Civil Procedure, would appear to have been waived. Fish v. Bamby Bakers, Inc., 76 F.R.D. 511 (N.D.N.Y.1977); 5 C. Wright & A. Miller, Federal Practice and Procedure Sec. 1351 at 563 (1969 & Supp.1983)